JAMES ORR v. SHELL OIL COMPANY, a Corporation, and PAUL STRAIN, Appellants.—No. 38581.—177 S. W. (2d) 608.

Division One, December 6, 1943.

Rehearing Denied, January 3, 1944.

Motion to Transfer to Banc Overruled, February 7, 1944.

*Jones, Hocker, Gladney & Grand* and *Lon Hocker, Jr.,* for appellants.

290

*J. Edward Gragg* and *Wm. R. Schneider* for respondent.

DOUGLAS, J.—This is an action for damages for personal injuries. Orr, the plaintiff, was employed as a laborer by the Whitmire Research Corporation, manufacturing chemists of St. Louis. Whitmire had a contract with the Shell Oil Company to compound, according to Shell's formulae, insect spray sold under the Shell name and label. Shell furnished the formulae and specifications, chemicals and other ingredients, cans and containers. Whitmire compounded the products on its premises, packaged and shipped them according to Shell's orders. One of the ingredients furnished by Shell for the insect spray was a chemical known by the trade name of Kesscocide. It was a synthetic, patented compound known chemically as alphanapthylisthiocyanate. A white chrystalline solid, it looked like salt or sugar. The chemical was dissolved in a base oil which acts as the carrier in a spray. Orr was employed in mixing the spray. He first had to break up the caked chemical with a hammer in the barrel in which it came. Then with a hand scoop he put twenty-one pounds of it in a canvas sack. He tied the sack containing the chemical onto an outlet of an oil line carrying the base oil. The oil ran through the sack dissolving the chemical and emptied

into a 500-gallon mixing tank. To insure that all of the chemical would be dissolved Orr squeezed out the sack at the end of each run of oil. Then he stirred the mixture in the tank with a large paddle inserted through a manhole in the top of the tank. In breaking the chemical he breathed the dust arising from it and in scooping it out of the barrel his skin came in contact with it. When he squeezed out the sack the solution got on his hands and arms. His clothes became soaked with the solution. Three or four days after he first used the chemical he noticed a rash on his hands which later covered his entire body. A swelling developed over his body. The skin irritation increased as did the swelling, producing a nervousness, temperature, itching and loss of weight and finally the skin peeled from all over his body. The severest injury he suffered was a permanent, chronic nephritis, or chronic inflammation of the kidneys known as Bright's disease.

Paul Strain, codefendant with Shell, was employed by Shell to inspect the products prepared by Whitmire. He is a chemical engineer twenty-nine years of age. He was stationed on Whitmire's premises. His duties were to test the finished products for compliance with the formulae and to inspect the packages for shipment.

Orr recovered judgment against both Shell and Strain for $40,000, which was reduced to $20,000 by remittitur on order of the trial court. Shell and Strain appeal.

The petition charges that Shell and Strain, knowing the dangers to the human body from working with alphanaphthylisthiocyanate, failed to warn Orr of them. It further charges that Orr was under the immediate control of Strain in mixing the chemical. These charges were submitted to the jury.

On appeal the contention is made there was no proof that Orr was under the control of Strain, so there was no duty on the part of Strain, and consequently on the part of his employer, Shell, to warn Orr about the dangers in using the chemical. We need not decide that question. Orr assumed a greater burden than necessary for recovery in this case by attempting to show he was directed in his work by Strain. He did this, no doubt, to supply the basis for the duty to warn. But the duty to warn was already imposed on Shell if it knew or should have known the dangers inherent in the chemical.

Orr's expert testified that the chemical, being an alpha compound of naphthyl, was toxic and was long known to be so. He stated that wringing out the sack in which the chemical was dissolved by the base oil brought the solution in contact with the skin which irritated and inflamed it. Also the solution was absorbed into the system and affected the kidneys.

Shell's own chemist, assigned to make the "real chemical test" when it was considering Kesscocide as an ingredient in making the spray, testified the chemical in a solution of one-half of one per cent by weight was demonstrated, after experiments, to be non-toxic to

warm-blooded animals. But he also said: "Kesscocide will certainly be toxic if a man handles it with his hands in liquid form. If a man had to take his hands and squeeze a bag of Kesscocide hanging in a bag over base oil, and base oil was run through it, it would be toxic . . . If you made a solution of Kesscocide and sit down and get pants sopping wet with it and slop around in it for a number of hours, it is toxic . . . If you stick your hands in a solution of Kesscocide and keep it that way for hours, Kesscocide is toxic to a human being under ▮▮▮ those circumstances. If you inhale granulated Kesscocide into your lungs, I presume it would be toxic under those circumstances."

This knowledge of the inherent danger of the chemical is sufficient to impose on Shell the duty to warn.

Besides this, Shell knew how the chemical was to be handled in mixing the spray because they directed in writing that: "In manufacturing the above products the Kesscocide No. 95 should first be dissolved in the major portion of the odorless base. This may be accomplished by placing the crystals in the blending tank, adding odorless base and stirring until dissolved, or better still, placing the crystals in a solution basket and pumping the odorless base through. In the latter case complete solution should be achieved while charging the odorless base to the mixing tank. After complete solution of the Kesscocide is obtained, add the remaining ingredients and complete mixing in the usual manner." The sack used is the solution basket mentioned.

The rule is now well settled that a duty is imposed upon the one who furnishes an article which he knows, or ought to know, to be peculiarly dangerous to give notice of its character or bear the natural consequences of his failure to do so. This rule originated as an exception to the general rule of non-liability where no privity of contract exists, and was applied in cases involving injuries from poisonous drugs, chemicals, explosives or articles inherently dangerous to person or property. See Callahan v. Warne, 40 Mo. 131; Heizer v. Kingsland & Douglass Mfg. Co., 110 Mo. 605, 19 S. W. 630; Lenz v. Standard Oil of N. Y., 88 N. H. 212, 186 A. 329. The rule has been extended to cover articles not only inherently dangerous in their nature, but dangerous because of the use to which they are to be put by whoever may use them for the purpose intended. See Anno. 17 A. L. R. 683; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S. W. (2d) 122. The danger is none the less inherent because it is brought into action by some external force. Farley v. Edward E. Tower Co., 271 Mass. 230, 171 N. E. 639, 86 A. L. R. 941. The basis of liability is not in contract but arises from a social responsibility to use due care to avoid injuring those persons likely to be injured if such care is not used.

The rule has been more fully expressed in the Restatement of Torts, sec. 388 where its application to this case is plainly demonstrated. It

is stated there: "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows, or from facts known to him should realize that the chattel is or is likely to be dangerous for the use for which it is supplied;

(b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

See Bosserman v. Smith, 205 Mo. App. 657, 226 S. W. 608; Martin v. Maxwell-Brisco Motor Vehicle Co., 158 Mo. App. 188, 138 S. W. 65; Harmon v. Plapao Laboratories (Mo. App.), 218 S. W. 701.

The evidence shows that Strain had no knowledge of the toxic quality of the chemical before Orr was injured by it. Nor was there sufficient evidence to submit to the jury the question whether Strain should have known of its dangers. The chemical was furnished under its trade name, Kesscocide, a product new and unknown to him. His duties did not call for an analysis of the chemical but only of the finished insect spray. He had worked for Shell but a little more than a month before Orr was injured. As to him the demurrer should have been sustained.

A number of other assignments of error are advanced. Questions were asked several witnesses about the presence of carbon tetrachloride. Objections were made each time because "immaterial to the issues of the case," nothing more. Carbon tetrachloride was an ingredient furnished Whitmire by Shell. The evidence is not clear if it was for the insect spray or some other product. Whether the questions were so patently immaterial that the objection was sufficiently definite (Long v. Woolworth, 232 Mo. App. 417, 109 S. W. (2d) 85) need not be decided because the jury were instructed that recovery could not be had for injuries caused by any chemical other than Kesscocide. This amounted to a withdrawal instruction of testimony about carbon tetrachloride and sufficed to cure the error, if it was error, in admitting such testimony.

Three letters exchanged between Whitmire and Shell after Orr was injured, one postponing the use of Kesscocide for the time being, one relating to Orr's injuries and one to future protective measures, were introduced by Orr. They are objected to because they were written after Orr was exposed to the chemical. However, the latter two are relevant in view of Shell's denial that the chemical was dangerous and its pleaded defense of contributory negligence. If the first letter, stopping the use of Kesscocide for the time being, was irrelevant its admission was harmless.

296

The question was asked of Dr. H. E. Whitmire whether Orr had made a claim against his company under the Workmen's Compensation Act. In ruling an objection to the question the court volunteered: "While the witness is called by the plaintiff, the assumption is—the court's assumption in this case is—that this man is an unwilling witness." This statement does not offend the ruling in McElwain v. Dunham (Mo. App.), 221 S. W. 773 that the court should not comment on the *credibility* of the witness. There the court said of the witness in the hearing of the jury: ". . . he must tell the truth, and, if he will not, they can put leading questions to him." The court's comment in this case was not about the witness' credibility.

Complaint is made about the refusal to admit into evidence a reprint from a journal called "Soap" describing the effect of the chemical on rats, dogs and man. The article was entitled "A NEW SYNTHETIC INSECTICIDE by Nathaniel Tischler and Arno Viehoever Kessler Chemical Corp." Kessler Chemical Corp. was the corporate parent of Kesscocide. The article is urged as the best evidence of what the chemical fraternity knew at the time about Kesscocide. We think it was irrelevant. In the experiments on human beings it dealt not with the chemical in its concentrated state but as diluted in the insect spray. The court did not abuse its discretion in excluding it.

Heinrichs, one of Orr's witnesses, was a consulting chemist, industrial chemist, toxicologist, also a pharmacist. It is argued he was not qualified to state the chemical was toxic to the human body. We find the objections in the record were directed against the quality of Heinrichs' testimony, rather than against his qualification as an expert, so were for the jury. Furthermore, Shell's evidence of the toxicity of the chemical corroborates his testimony. Similar objections are made about the testimony of Orr's medical doctor. He frankly admitted he had no previous experience with the effect of Kesscocide particularly, but pointed out it came within the general classification of toxic poisons and it would affect the kidneys just as other toxic poisons. Such testimony is proper and the objection to it is not well taken.

The verdict, reduced to $20,000 by remittitur, is claimed to be excessive. Orr was about thirty years old when he was injured. He had formerly worked at installing furnaces, was vigorous and in good health. His injuries put him under the doctor's constant care for six months, and twice in the hospital. He lost about twenty-five pounds. He suffered pain from the skin irritation. The evidence shows the diseased condition of his kidneys will be permanent and will affect his whole health. He is continually tired; his feet burn and swell; he must urinate as many as five or six times during the night and about every hour during the day. Since he was injured he has worked intermittently at light work. According to the doctor

he is permanently restricted to light work in the future and then only "if he takes plenty of rest in between times and doesn't take hours too long, and remains on his diet." He must observe a strict diet for the rest of his life. There is no evidence of loss of earnings caused by the injuries, medical expense, or probable loss of future earnings. Damages were asked only for pain and suffering and for permanent injuries.

The extent of Orr's injuries can not be ascertained from observation such as would be the case in the loss of an arm or an eye but must be determined from the testimony of the witnesses. The weight and credibility of such testimony is of course for the jury, and the compensation the jury awards for injuries of such a character should not be disturbed unless manifestly excessive. Hoelzel v. Chicago, R. I. & P. R. Co., 337 Mo. 61, 85 S. W. (2d) 126. The award of $40,000 was excessive but it was reduced to $20,000 by the trial court. The question of excessiveness of the reduced amount after remittitur is for this court to decide, yet "we are usually reluctant to require a further remittitur after the trial court has directly passed upon the excessiveness of an award by substantially reducing the amount thereof." Schaefer v. Transamerican Freight Lines (Mo. Sup.), 173 S. W. (2d) 20. Moreover, a rule of decision has arisen which says where injuries and losses are similar there should be reasonable uniformity in the amounts awarded. Goslin v. Kurn, 351 Mo. 395, 173 S. W. (2d) 79. In Myers v. Chicago, B. & Q. R. Co., 296 Mo. 239, 246 S. W. 257, an award of $20,000 to a man twenty-three years old at the time of trial was held not excessive where his chief injury was Bright's disease caused from burns. If we are to observe the rule of uniformity we must defer to the ruling of the trial court in this case. Accordingly, we hold the $20,000 award not excessive.

Other assignments of error are argued but they are either not supported by the record as we find it or by the cases relied on.

The judgment as to Shell is affirmed; the judgment as to Strain is reversed and the cause is remanded with directions to dismiss as to him.

Affirmed in part, reversed and remanded in part. All concur.

## On Motion for Rehearing.

 DOUGLAS, J.—In its motion for rehearing Shell says "the opinion imposes liability upon this defendant for a tort which was neither pleaded nor submitted to the jury." Some repetition of what is stated in the opinion is necessary in answering this charge. We reiterate this is an action for damages for personal injuries resulting from the handling of a poisonous chemical furnished by Shell to Orr's employer and used as Shell specified in written directions. It is not

disputed that Shell furnished the chemical. Shell's own chemist testified he knew the chemical was toxic.

As we read the record the tort pleaded and submitted was the failure of Shell to warn of the danger known to it in using the chemical. In order to impose this duty to warn on Shell, plaintiff attempted to prove that Strain, Shell's inspector on the premises, was authorized by Shell to direct the handling of the chemical, assumed control of Orr and ordered him to work in a manner causing exposure to the chemical when Strain should have known the chemical was toxic. But plaintiff did not need to assume such burden because of the well-established rule that imposes directly a duty to warn on one who supplies an article he knows is likely to be dangerous for the use intended.

What was the charge pleaded? We repeat the words of the petition, omitting such as are unnecessary to this discussion: "Plaintiff states Shell furnished certain chemicals for the manufacture of insecticides [which] were poison chemicals and Shell knew of the danger to the health of persons working with same more specifically plaintiff herein. Shell neglected, failed and omitted to warn plaintiff· of the known dangers to his health and body in working with the said chemicals when Shell knew of the danger to the human body in working with the said chemicals and Shell further knew that plaintiff was unaware of said dangers."

What was the charge submitted? We repeat the words of plaintiff's principal instruction again omitting such as are unnecessary to this discussion: "The court instructs the jury that if you find the plaintiff was ordered by his employer to work at mixing or compounding certain insecticides according to prescribed formula of Shell in a manner that his skin and body was exposed to and did have contact with said chemicals and that as a direct result plaintiff was made sick and unhealthy, and if you further find that plaintiff had no knowledge of the likely serious and dangerous effects to health from contacts with said chemicals and was not warned thereof by Shell or by plaintiff's employer and if you further find that Shell knew of the danger to the human body and particularly to plaintiff by such contact with said chemicals and if you further find Shell knew that plaintiff had no knowledge of said likely danger in said mixing then Shell was negligent in failing to warn plaintiff."

Thus it appears to us failure to warn, the tort relied on and proved, was both pleaded and submitted.

▮ Shell has other complaints about our decision. It says since we have reversed the judgment against Strain, the individual resident defendant, we should remand the case to permit Shell, as a nonresident, to remove it to the United States Court and retry it there. It offers no authority in support of this contention. Those we find rule to the contrary. The elimination of the party defendant, whose presence ▮ prevents removal, by a ruling on the merits adverse to the

plaintiff and without his assent does not make the case a removable one. 45 Am. Jur. 901; 54 C. J. 285. ''It is well established that if a case is nonremovable when begun it can be made removable only by a voluntary dismissal or nonsuit by the plaintiff, as to the resident defendant . . . The sustaining of the demurrer to the evidence as to the resident defendant was a ruling in invitum and the case was not removable. . . .'' citing cases. Garnett v. S. S. Kresge Co. (Mo. App.), 85 S. W. (2d) 157, 163 [11].

Shell also complains our opinion fails to pass upon and dispose of points decisive of the case which it presented in its brief. The opinion states ''other assignments of error are argued but they are either not supported by the record as we find it or by the cases relied on.''

▮ The first such point is that plaintiff's principle instruction submitted four propositions for which there was no proof, namely Strain by authority directed the mixing, assumed control of Orr, and ordered Orr to work in the manner causing exposure when Strain knew the chemical was dangerous. We ruled the evidence was insufficient to show Strain knew the chemical was dangerous. We stated it was unnecessary to consider the evidence about the other propositions as they were not required for plaintiff's recovery. In a similar situation this court held an instruction was harmless which required the finding of a fact not proved by the evidence when proof of such fact was not needed to make a case. Scott v. Missouri Pac. R. Co., 333 Mo. 374, 62 S. W. (2d) 834 [8, 9]. That ruling is apposite here. See also Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S. W. (2d) 91, 98 [12]; Tash v. St. Louis-S. F. Ry. Co., 335 Mo. 1148, 76 S. W. (2d) 690, 698 [9].

▮ For the second such point Shell objects to the admission of evidence as to the amount of workmen's compensation received by plaintiff. If this was error, it was in answer to evidence adduced by Shell itself that plaintiff had filed a claim and received such compensation. Being self-invited Shell may not complain. Lewis v. St. Louis Independent Packing Co. (Mo.) 3 S. W. (2d) 244, 250 [11]. We find under somewhat similar circumstances evidence of the amount of workmen's compensation received by a plaintiff was held to be harmless if such was error. Thompson v. A. Morgan H. & E. (Mo. App.), 26 S. W. (2d) 807, 809 [2]. After plaintiff testified he had received between $550 and $600 compensation, Shell offered to prove on recross examination the reason he had not received more was because he chose voluntarily not to accept any more until his claim against Shell had been litigated. The court excluded this testimony. Shell complains such action is unfair and relies on the maxim: ''What is sauce for the goose is sauce for a gander.'' But doesn't Shell, who started the line of inquiry about which it now complains, confuse the gander and the goose? Be that as it may, each has enjoyed his sauce. The extent of cross-examination is a matter largely within the dis-

cretion of the trial court. The rulings will not be disturbed unless an abuse of discretion is shown and none has been shown here.

The final point Shell says is decisive of the case was left undecided by the opinion arises from a conflict in the parties' instructions. We find no such conflict when the instructions are read together as they must be. Plaintiff's instruction 2 told the jury if, under the evidence and other instructions, it should find for plaintiff then the negligence of plaintiff's employer should not influence the amount of the verdict and concluded: ''The amount of your verdict in such event will be governed entirely by the court's instruction on the measure of damages, which instruction is numbered 8.'' Instruction 3 for plaintiff after referring to the other instructions told the jury the amount of workmen's compensation received by plaintiff has no bearing on the amount of the verdict and closed with the same conclusion.

Instruction 7 for Shell with which 2 and 3 are said to conflict states: ''The court instructs the jury that the plaintiff cannot recover from defendants under any circumstances for injuries caused by any chemical other than Kesscocide.''

Plaintiff's instruction 8 was the usual measure of damages instruction to be followed ''if under the evidence and the other instructions'' the jury finds for plaintiff.

Plaintiff's instructions 2 and 3 are not as clearly phrased as they should be. Still, the statement that the amount of the verdict shall be "governed entirely" by number 8 does not conflict with Shell's number 7 when all the instructions are read together. Plaintiff's instructions reiterate they should be read together. The jury could consider number 8 only if it first found under number 7 that plaintiff's injuries resulted from Kesscocide. If the jury found such to be the fact then the amount of the verdict must be governed by the requirements of number 8.

We find no point decisive of the case was overlooked in the opinion. We find no constitutional or other right of Shell has been violated by our decision in this case. The record indicates that Shell had a fair trial before a jury. The jury returned a judgment against Shell, reduced by remittitur in the trial court. Our decision affirmed the judgment. The motion for rehearing contains no just reason for now overturning the judgment. The motion is overruled. All concur.