George **ALEXANDER**, Appellant,

v.

**INLAND STEEL COMPANY**, a Corporation, Appellee.

No. 16035.

United States Court of Appeals
Eighth Circuit.

Dec. 31, 1958.

Jack G. Beamer, Kansas City, Mo. (McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, Mo., on the brief), for appellant.

Harry P. Thomson, Jr., Kansas City, Mo. (John R. Caslavka, Shughart & Thomson, Kansas City, Mo., on the brief), for appellee.

Before JOHNSEN, VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

In this personal injury case plaintiff-appellant appeals from the action taken by the trial court at the close of plaintiff's evidence when defendant's motion for directed verdict was sustained and judgment rendered against plaintiff. Diversity and amount involved give us jurisdiction.

In accordance with our Rule 10(f), United States Courts of Appeals Rules, 8 Cir., 28 U.S.C.A., the record is presented to us in the form of a statement of facts, agreed to by the parties and duly approved by the trial court. Since one of the crucial issues is necessarily focused upon the sufficiency of the evidence to require submission of the case to the jury, we indulge in an exhaustive review of the pertinent facts.

On January 28, 1957, when plaintiff received the injuries for which he seeks recovery in damages, he was employed by the Western Fireproofing Company (for sake of brevity called "Western"), and was working as a member of a gypsum roofing gang in constructing a roof on a school building in Belpre, Kansas. Plaintiff's employer specialized in fabricating poured gypsum roof decks. This process required the spacing and spot welding into place of steel sub-purlins,[1] to support form boards, and pouring liquid gypsum over the form boards and encasing the sub-purlins. The bulb tees used in the Belpre, Kansas, job were ordered by Western directly from defendant-appellee in the fall of 1956. They were shipped by carrier selected by defendant from the latter's yards in Chicago, Illinois, to Hutchinson, Kansas, and from there were taken by plaintiff's employer to Belpre, Kansas. Four employees of Western testified that the sub-purlins for the Belpre roof appeared new, painted, and unused, and that they could see no defects in any of the pieces.

The bulb tees ordered for the Belpre job were in two lengths: 12 feet, 11½ inches and 13 feet, 6 inches; were 1.78 inches high, 1.90 inches wide at the base and 9/64 inch thick through the base and stem. The bulb at the tip of the stem was 7/16 inch high and ½ inch wide. They were rolled from high carbon steel obtained from used railroad rails, and were so described in defendant's advertising.

The president of Western, a graduate engineer, testified that he had been using these bulb tees in his work for about ten years, that they had been purchased from defendant, that he knew they were made of high carbon steel, that he was not a metallurgist or a welding expert, but was sure that the bulb tees would have all the characteristics of high carbon steel, that he had no previous knowledge of bulb tees breaking or shearing, that it was the customary and regular practice to stagger the welds, that he had no knowledge that bulb tees made of high carbon steel were particularly susceptible to breaking or cracking if welded by an electric arc welder during temperatures below 32° F.

When work began on the roof deck of the Belpre school on January 21, 1957, the heavy 24-inch trusses and 10-inch I beams were in place. To the I beams, Western employees welded the bulb tees on 32-inch centers, each bulb tee being supported by three I beams and spot welded to these beams at each end of the bulb tee and in the middle. Although the superintendent of the Western crew on the job testified that the specification for the job called for the welds to be staggered, they were not always staggered from one side to the other. It was customary for workmen to walk upon the bulb tees; in fact, after the form boards were placed, only the bulb and a part of the stem were visible and workmen had no choice but to walk upon the bulb tees.

Tommie Ince, another Western employee who did all of the welding on the Belpre job, had been engaged in that trade for eight months to a year. He had

---

1. Frequently referred to in record as bulb tees because they are shaped like an inverted T with a bulb at the tip of the stem; we shall designate and refer thereto as "bulb tees," "T bars," or "sub-purlins."

received no formal training, had learned to weld by watching others, had received no specific instructions from his foreman as to how the welding should be done on the Belpre job, and had not seen any specifications by the manufacturer with respect to welding. Ince used an electric arc welder and usually made a ¼ to ½ inch spot weld between the flange of the bulb tee and the supporting I beam.

On January 28, 1957, the gypsum had been poured on one-half of the roof, and the men, including plaintiff, were laying form boards between the spaced and welded bulb tees on the unpoured half of the roof. Plaintiff had placed a load of form boards and while walking on the T bars diagonally across and up the roof toward the cone, a T bar upon which he had placed his weight (of 159 pounds) broke in the middle in the vicinity of the supporting I beam, causing plaintiff, the two pieces of the broken T bar and several pieces of form board which had been placed in the area, to fall approximately twenty-two feet to the concrete floor below, thereby injuring plaintiff.

The exact date that the particular bulb tee which broke was welded into place is not known; consequently, the temperature reading when the welding took place is likewise not revealed. The record does disclose the high and low temperature of each day between January 21, when work commenced and January 27, 1957, when plaintiff was injured. See footnote 9, infra.

In addition to the foregoing, which establishes some background as well as the circumstances immediately surrounding the occurrence, there was expert testimony dealing with the characteristics of high carbon steel and its reaction to welding, which will receive added attention in the further course of our opinion.

During a pre-trial conference the trial court informed counsel for plaintiff that the cause would not be tried or submitted on the theory of implied warranty because the petition disclosed there was no privity of contract between plaintiff and defendant. Plaintiff now makes the assignment that the court committed error in so ruling.

The legal problems and solutions stemming from the warranty-privity question in today's modern market of consumer products, with nation-wide advertising aimed at the ultimate consumer, indicate a trend toward relaxation of the privity requirement as to certain products. Briefly stated, it is possible to trace this progression first, through the gradual disappearance of the element of privity in negligence actions, first limited to negligence "imminently dangerous to the life and health of mankind" as to products which were inherently dangerous, "intended to preserve, destroy, or affect human life," [2] thence to the "MacPherson doctrine," whereby liability might attach when any negligently made product "is reasonably certain to place life and limb in peril when negligently made." [3] Liability has been further extended in recent years to include such seemingly innocuous products as a chair, bed, cigarette, coffee urn, and even a hair comb.[4] The "MacPherson doctrine" has recently been extended by a Missouri Court so as to enable a party not in privity with defendant repairman to recover *property* damages proximately caused by defective repair of a third party's vehicle. Central & Southern Truck Lines, Inc. v. Westfall GMC Truck, Inc., Mo.App., 317 S.W.2d 841. Compare Standard Conveyor Co. v. Scott, 8 Cir., 221 F.2d 460, 463, certiorari denied 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741, where this court, applying Missouri law, held that the evidence failed to show that a belt-conveyor system was "inherently or imminently dangerous," so as to come within the exception relaxing the privity requirement.

---

2. Huset v. J. I. Case Threshing Machine Co., 8 Cir., 120 F. 865, at page 870.

3. MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, 1053, L.R.A. 1916, 696; Restatement of Torts § 395.

4. See Noel, "Manufacturers of Products—The Drift Toward Strict Liability," 24 Tenn.L.R. 963, 967–68 and cases there cited.

As to the element of privity in actions on *"warranties,"* exceptions generally have been limited to food and beverage products, with isolated cases involving soap, cosmetics and other such personal items. Much has been written and no purpose would be served by an extensive review of the cases throughout the United States. For an excellent survey, see selection of papers read at the Meeting of the Torts Round Table, Assn. of American Law Schools, December, 1956, 24 Tenn.L.R. 923–1018, and especially, Noel, "Manufacturers of Products—The Drift Toward Strict Liability," beginning at page 963. See also Prosser on Torts § 84, at p. 510; 77 C.J.S. Sales § 305(b); Note, "Effect of Advertising on the Manufacturer's Liability," 22 Wash.U.L.Q. 406; and James, "Products Liability," 34 Tex.L.R. 44.[5]

■ More specifically directed to the situation here, in Kansas and Missouri privity is an element essential to recovery in an action for breach of a claimed warranty of the type of product here involved.

Under Kansas law, plaintiff relies heavily on Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887, in which it was held that a child of the purchaser would not be barred on privity grounds in an action to recover damages for injuries caused by a bursting bottle. Although the parties here disagree as to the import of this opinion—whether it was an actual "food and beverage" exception

or an extension of similar liability as to containers of same,[6] we find a comprehensive review of the law today in Kansas on implied warranties and privity requirements set out in Graham v. Bottenfield's, Inc., 1954, 176 Kan. 68, 269 P.2d 413. There, the Supreme Court of Kansas was concerned with a determination of whether a customer of a beauty shop could state a cause of action on implied warranty of fitness of the hair dye which caused her injury, against the distributor of same. While holding that plaintiff would not be barred by absence of privity, where, as in the Nichols case, "the source of the obligation (implied warranty) is imposed by the law on the basis of public policy," Id., 269 P.2d at page 418, the Court made it plain that its opinion should not be construed as a wholesale lifting of the privity requirement in Kansas. After reiterating the general rule of *caveat emptor* and necessity of privity in general, the Court, after noting instances of sales for *special* purposes, reviewed Kansas cases which set out food product exceptions to this rule, whereby an implied warranty of wholesomeness was imposed by law. In discussing the Nichols case, supra, the Court conceded that the doctrine was further expanded there to include an implied warranty of the safe character of bottles containing liquid beverages. Then, in careful language, the Court further extended an exception to the general rule of *caveat emptor,* holding that the manufacturer and distributor impliedly warranted the hair

5. Recent cases indicate that relaxation of the privity requirement continues to be restricted; Ross v. Philip Morris Co., D.C.W.D.Mo., 164 F.Supp. 683 (cigarettes); Cooper v. R. J. Reynolds Tobacco Co., D.C.Mass., 158 F.Supp. 22, affirmed, 1 Cir., 256 F.2d 464, appeal pending (Cigarettes—warranty count barred—no submissible case on deceit and fraudulent misrepresentation); Senter v. B. F. Goodrich Co., D.C.Colo., 127 F. Supp. 705 (Automobile tire—buyer-passenger allowed to recover on express oral warranty of defendant's agent, but driver of auto barred from action on the warranty and relegated to action solely in negligence); Duart v. Axton-Cross

Co., 19 Conn.Sup. 188, 110 A.2d 647 (Soap—employee of buyer not within statute extending implied warranties "to all members of the buyer's household"); Larson v. United States Rubber Co., D.C.Mont., 163 F.Supp. 327 (rubber boots); Green v. Equitable Powder Mfg. Co., D.C.W.D.Ark., 94 F.Supp. 126 and 95 F.Supp. 127 (dynamite cap—injured employee not entitled to recover on warranty—dealer-manufacturer's liability to depend on negligence); Caplinger v. Werner, Ky., 311 S.W.2d 201 (boat—guest injured in explosion barred on warranty count by absence of privity).

6. See Noel, 24 Tenn.L.R. 963, supra, at p. 989 for discussion of Nichols v. Nold.

dye to be fit for use, stating at 269 P.2d page 418:

"* * * we feel constrained to hold the scope of the exception to the common-law rule of *caveat emptor*, to which we have heretofore referred, should be extended to include sales *of the product here in question*." (Emphasis added.)

Then, citing Nichols, the Court found that plaintiff would not be barred by absence of privity when, as there, "the source of the obligation (implied warranty) is imposed * * * on the basis of public policy." Id., 269 P.2d at p. 418.

It is thus apparent that implied warranties, in the absence of privity, are restricted in Kansas to food and beverage products, glass containers of beverages, and hair dye.

In Missouri, it is equally clear that plaintiff is barred by absence of privity. Without privity,[7] recoveries on an implied warranty theory have apparently been limited to food and drink products. See Madouros v. Kansas City Coca-Cola Bottling Co., 230 Mo.App. 275, 90 S.W.2d 445; McIntyre v. Kansas City Coca-Cola Bottling Co., D.C.W.D.Mo.1949, 85 F. Supp. 708, appeal dismissed, 8 Cir., 184 F.2d 671; Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 143, 156 A.L.R. 469.[8] In the McIntyre case, supra, the district court, after an exhaustive review of the applicable Missouri law, refused to extend a further relaxation of the privity requirement by holding that no implied warranty arose for the benefit of the child of the purchaser who sought to recover damages in warranty for injuries caused by an exploding bottle. More recently, in Ross v. Philip Morris Co., D.C.W.D.Mo.

1958, 164 F.Supp. 683, the district court, after further review of Missouri law, refused to bring cigarettes within the food and drink exceptions. See also Dennis v. Willys-Overland Motors, Inc., D.C. W.D.Mo.1953, 111 F.Supp. 875 (defective automobile); and Wessley v. Seiberling Rubber Co., D.C.W.D.Mo., 90 F.Supp. 709 (automobile tire).

■ Since plaintiff in the case before us was obviously not a party to the contract of sale between his employer and the defendant, and thus could not claim the benefits arising from express or implied warranties, if any, arising therefrom, we find the trial court committed no error in refusing to submit the warranty theory to the jury.

Plaintiff next assigns as error the failure of the court to submit the case to the jury on the basis of defendant's negligence in manufacturing, inspecting and supplying the bulb tee in question. The assertion is advanced that the evidence, aided by the presumption of the *res ipsa loquitur* doctrine, was sufficient to warrant a jury in finding the defendant negligent.

■ In disposing of this contention, the question arises at the outset as to whether the issue of submissibility is to be determined by the law of Kansas, where the cause of action arose, or the law of Missouri, the *lex fori*. The law of the forum governs in making this determination. Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Illinois Fuel Co. v. Mobile & O. R. Co., 319 Mo. 899, 8 S.W.2d 834, 838, certiorari denied 278 U.S. 640, 49 S.Ct. 34, 73 L. Ed. 555. The uncontroverted rule is that the *lex loci* controls the substantial aspects of torts, and governs as to all matters going to the basis of the right of

7. Compare Finks v. Viking Refrigerators, Inc., 235 Mo.App. 679, 147 S.W.2d 124, involving an implied warranty of fitness for *special* purpose. There, after acknowledging that the element of privity was essential for recovery, the Court exhaustively reviewed the facts so as to find a "presumptive" privity whereby plaintiff, although actually buying through a distributor, was led to believe he was dealing directly with the manufacturer.

8. But see, Worley v. Proctor & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532, involving a soap powder. While reversing judgment for plaintiff, the Court stated that plaintiff would not be barred by absence of privity.

action itself, 15 C.J.S. Conflict of Laws § 22; 11 Am.Jur. Conflict of Laws § 14; Rhyne v. Thompson, Mo.Sup., 284 S.W. 2d 553, 556; O'Leary v. Illinois Terminal Railroad Co. (Mo.Sup., en banc), 299 S. W.2d 873. However, as to procedural matters, the law of the forum, in this case, Missouri, governs, Rhyne v. Thompson, supra; and since res ipsa loquitur is a part of the law of evidence, McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 92 A.L.R. 641; Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75, 79; Starks Food Markets v. El Dorado Refining Co., 156 Kan. 577, 134 P.2d 1102, 1104, in determining application of this principle, we look to Missouri law. See 11 Am.Jur. Conflicts of Law § 203.

■ As to the res ipsa loquitur doctrine, counsel for plaintiff with candor concedes that if the doctrine as applied in Missouri controls, plaintiff may not rely thereon because the defendant was not in exclusive control of the bulb tee at the time of the breaking thereof. As we have seen, res ipsa loquitur is a part of the law of evidence and Missouri law controls in its application. Under the factual situation present, and under Missouri law, resort may not be had to the doctrine. See McCarty v. Hosang, D.C. W.D.Mo.S.D., 154 F.Supp. 852, where the elements necessary for application of the doctrine are enunciated; Wallace v. Knapp-Monarch Co., 8 Cir., 234 F.2d 853, at page 858, where this court in an exhaustive opinion dealing with the subject stated:

"It is thus apparent that the Missouri interpretation of the rule coincides with the general view that the doctrine is not applicable where the control or right of control of the instrumentality causing the injury was not in the defendant at the time of the injury."

The rule in Kansas is of like effect, Starks Food Markets v. El Dorado Refining Co., 156 Kan. 577, 134 P.2d 1102, 1105; Franks v. Groendyke Transport, Inc., 10 Cir., 229 F.2d 731, 734, and cf. Johnson v. Latimer, 180 Kan. 720, 308

P.2d 65, 68, which recognized, as we do, the distinguishing feature of Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887, here relied upon by plaintiff.

■ Although plaintiff makes the broad assertion that there was probative evidence from which a jury could find the defendant was negligent in manufacturing, inspecting and supplying the bulb tee which fractured, the specific evidence to support the charge has not been brought to our attention, and, we may add, a painstaking analysis of the record convinces us that there was a total failure of proof in this respect. After plaintiff frankly conceded in his brief that neither he nor his expert witness, who examined the bulb tee after it had broken, was able to find a specific flaw or defect which caused it to break, he advances possible theories of negligence. First, it is suggested that the bulb tee, which was rolled from used railroad rails, contained a crack or defect which had existed previously in the railroad rail and which was not detected by defendant prior to rolling. Next, it is said that the crack or defect was created in the bulb tee during rolling and cooling. The fatal weakness of both theories is that they are completely without factual support. There was no evidence establishing, or from which a legitimate inference could be drawn, that the piece of steel from which the bulb tee was made was defective in any respect, or that a crack or defect was created in the process of rolling and cooling the bulb tee.

■ We are in full accord with plaintiff's contention that facts necessary to sustain a recovery may be established by circumstantial evidence. Under Missouri law, the only qualification is " * * that the evidence must rise above the stature of guesswork, speculation, and conjecture, and must point to the desired conclusion with such a degree of certainty as to make the particular conclusion more reasonable and probable than any other that might be drawn. This for the obvious reason that if the circumstances afford no more than an equal basis for

two or more inconsistent conclusions as to the existence of the essential fact, then in that event the party having the burden of proof may not be said to have sustained his obligation. Bates v. Brown Shoe Co., 342 Mo. 411, 116 S.W.2d 31; Schoen v. Plaza Express Co., Mo.Sup., 206 S.W.2d 536; Bowers v. Columbia Terminals Co., Mo.App., 213 S.W.2d 663." Riley v. St. Louis Public Service Co., Mo. App., 245 S.W.2d 666, at page 670.

The circumstantial evidence upon which plaintiff relies, whereby the course and presence of the bulb tee was accounted for from the time it was delivered by defendant at Hutchinson, Kansas, until it broke under plaintiff's weight which evidence also afforded some proof that the bar was not injured or damaged in handling, does not have such qualitative value that the necessary facts to support a verdict may be inferred and must reasonably follow. In other words, such circumstances are insufficient to support the inference that there was a defect in the subject bulb tee and that defendant was negligent in not discovering such weakness. The inference which plaintiff would have us draw from the circumstantial evidence runs headlong against the direct testimony of his expert witness, Dr. Kenneth Eugene Rose of the University of Kansas, who, with Dr. Kurata of the same institution, examined the two pieces of the broken bulb tee, made hardness tests and microscopic examinations. Dr. Rose testified that he found some cracks in the area of the weld, but none elsewhere, and that except for the rear of the weld where the fracture occurred, he found no defect in the T bar. From other testimony, it appears that some cracks are normally to be expected from any welding process. It was his opinion, based on the assumption that if the weld was made and the weight applied when the temperature was between 12° and 30° F., that the fracture of the bar was "due to the weld and its effect on the surrounding metal under these conditions * * *." We need not determine whether the evidence conclusively establishes that the breaking of the tee bar was proximately caused by a defective weld, or because of a proper weld made under unusual temperature conditions, although, from the evidence, it is equally suggestive, if not more so, that the breaking resulted from an improper weld made under normal weather conditions, for which defendant could not be liable, rather than to an inherent or latent defect in the bulb tee, for which the defendant might be liable. Since the circumstances upon which plaintiff must rely " * * * afford no more than an equal basis for two or more inconsistent conclusions as to the existence of the essential fact" there was no legal basis for submitting the question of negligence to the jury. Riley v. St. Louis Public Service Co., Mo.App., 245 S.W.2d 666, 670, and cases cited. The Kansas courts also recognize and apply this principle. See Stroud v. Sinclair Refining Co., 144 Kan. 74, 58 P.2d 77; Modlin v. Consumers Cooperative Ass'n, 172 Kan. 428, 241 P.2d 692; Branstetter v. Robbins, 178 Kan. 8, 283 P.2d 455.

Finally, plaintiff contends that the evidence required submission of the case to the jury on the theory of defendant's negligence in failing to warn plaintiff and plaintiff's employer of the dangerous limitation of the product involved when applied to the use for which it was sold.

To support this assignment, plaintiff cites numerous authorities which recognize the well-settled principle that a manufacturer may be liable, in the absence of privity, for failure to warn of an inherently dangerous or imminently dangerous article, even though not negligently made. However, inasmuch as the tee bar here in question is readily distinguishable from products containing dangerous chemicals, goods made of inflammable substances, etc., and since the record is completely void of evidence proving or warranting a permissible inference, that the tee bulbs were inherently dangerous as such, discussion of cases dealing with this principle is unnecessary. Those interested may see Dillard and Hart, "Product Liability: Directions

For Use and the Duty to Warn," 41 Va. L.R. 145.

Although no Kansas case has been brought to our attention, and research has not disclosed that the Kansas courts have spoken on the question, in many jurisdictions a principle has emerged whereby the manufacturer's duty to warn has been extended to cover articles not only inherently dangerous in their nature, but dangerous because of the use to which they are to be put by whoever may use them for the purpose intended.

The Missouri Supreme Court recognized this duty in Orr v. Shell Oil Co., 352 Mo. 288, 177 S.W.2d 608, at page 612. The principle was applied in Tomao v. A. P. De Sanno & Son, 3 Cir., 209 F.2d 544, 546 (Mass. substantive law), as to latent limitations of a grinding wheel; Hopkins v. E. I. Du Pont De Nemours & Co., 3 Cir., 199 F.2d 930 (Pa. law), involving explosives; Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626, holding that plaintiff made a submissible case when vapors from "Ben-Gay" ignited when he lit a cigarette, causing his pajama top to catch fire and injure him. See also Restatement of Torts § 388; Annotation 86 A.L.R. 947; and Dillard and Hart, 41 Va.L.R. 145, supra.

■ While a manufacturer may, under proper circumstances, be obligated to give warning if the article is dangerous because of the use to which it is to be put by whoever may use it for the purpose intended, for reasons presently stated, we need not determine whether a warning was necessary in this case.

■ As we view and understand plaintiff's lengthy discussion of this point in his brief, it is his contention that there was evidence affording proof that the steel sub-purlins were likely to crack if they were spot welded in freezing temperature, and that when weight was applied under the circumstances here present, they were unsafe and would fracture. Assuming, arguendo, that the sub-purlins possessed dangerous limitations when welded and when walked upon in freezing temperature, and that defendant had knowledge of this limitation; nevertheless, there is no evidence from which it may legitimately be inferred that the sub-purlin in question was welded in freezing temperature and that as a direct and proximate result thereof, it was caused to break. While the record discloses that between January 21, when work was commenced on the roof, and January 28, 1957, when plaintiff was injured, the temperature was on certain days below freezing,[9] plaintiff readily concedes that the evidence does not show that the sub-purlin was welded to the I beam at a time when the temperature was below 30° F.; consequently, no one can say without resort to speculation and conjecture that the weld was made under such conditions so as to render the sub-purlin unsafe and dangerous for the use intended. In this connection Dr. Rose testified that in his opinion, "the weight of a 158 pound man applied in the vicinity of the center weld of this particular T bar, *assuming that the weld was made and the weight was applied when the temperature was between 12° and 30° F.*, could and did cause the bar to break or fracture and that it was due to the weld and its effect on the surrounding metal under these conditions that the fracture resulted." As to the effect of temperature at the time of welding, Rose testified as follows: "Well, the temperature at the time of welding is not really of major importance although it is of some importance * * * It would have some bearing but I am not sure in my own mind that this is extremely important." In the absence of probative evidence to establish, even by inference, the existence of the necessary and essential elements which conceivably

9. The temperature varied as follows: January 21, high 55°, low 18°; January 22, high 63°, low 13°; January 23, high 20°, low 2°; January 24, high 30°, low 11°; January 25, high 27°, low -5°; January 26, high 15°, low -3°; January 27, high 15°, low 10°; January 28, high 28°, low 12°. All readings are Fahrenheit.

could render the sub-purlin dangerous for its intended use; viz., the welding and application of weight in freezing weather, it logically follows that such asserted limitation could not have been the proximate cause of the incident which led to plaintiff's injury.

From the foregoing, the conclusion is inescapable that a submissible case was not made on the issue of failing to warn.

Affirmed.