[No. 27655. Department Two. December 12, 1939.]

AUBREY FRANCIS CLARK *et al., Appellants,·* v. THE CITY OF BREMERTON, *Respondent.*[1]

'Reported in 97 P. (2d) 112.

*F. W. Moore* and *James Munro,* for appellants.

*Bruce Bartley, George Bovingdon,* and *James W. Bryan, Jr.,* for respondent.

GERAGHTY, J.—This action was brought by the plaintiffs to recover for the death of their minor son, Lyle Aubrey Clark, alleged to have been caused by the negligence of the defendant, city of Bremerton. At the close of the plaintiffs' case, the court granted the defendant's motion for nonsuit and entered a judgment dismissing the action with prejudice. Plaintiffs appeal.

May 19, 1938, the water department of the respondent city was engaged in excavating a trench along the side of one of its streets preliminary to the installation of a water main. The crew employed on the trench worked a six-hour day, or until two-thirty or three o'clock in the afternoon. It was the city's practice to place lighted flare pots along the excavation at the close of the day's work to warn users of the street of the danger incident to the open trench.

Sometime between five-thirty and six o'clock, on the

afternoon of the 19th, after the crew had ceased work and the lighted flare pots had been set, three of the appellants' children, Lyle, the deceased, ten years and nine months of age, a younger sister, and Arley, a brother, fourteen, together with Loren Hooper, were playing in the trench at a point where it was about three and a half feet deep. Lyle reached out of the ditch and drew one of the lighted flare pots towards him so that he could melt some tar in the flame. Some of the kerosene escaped from the pot, ignited, and set fire to the boy's clothing, causing the burns that resulted in his death. Arley Clark, the deceased's older brother, describing the accident, testified as follows:

"Q. Just tell the jury what happened. A. Well, he went and tipped the smudge pot. . . . He tipped the smudge pot over a little ways and then the oil went down on the side, and he did that once, and he was successful, and the second time the top blew off and he caught fire. Q. Why do you say the top blew off? A. Well, I imagine it was the top because it was a big PUFF! and it just went right in his face. . . . Q. . . . Show the jury what your brother did. A. Well, he was about down like this and he tipped it over just a little ways and then he took hold of the chain and he had a rock here and he tipped it over like that, and then the oil ran out on the side and then it started blazing. Q. And then what happened again? A. Well, he did it the second time, and then . . . He used two rocks this time, and instead he tipped it like this, and it went and puffed in his face. . . . Q. Did it make any noise? A. No, it just went PUFF! —like that, sort of. Q. Did you see where the fire caught him? A. Yes, it hit him in front, about here, all over on his head. . . . Q. Now, did he say anything to you before he tipped it over? A. Well, the first time he never said nothing. He was just tipping it over. And then the second time he says, 'Look, Arley, look what I can do,' and then he went and started to fix it and then he went and looked .to see if I was looking, and he tipped it."

On cross-examination, Arley testified:

"Q. And the ditch came up about where on Lyle? A. Right in about the neck. Q. And did he have a rock in both hands? A. He did the second time, but not the first. Q. Well, now, what did he do the first? A. Well, he took hold of it like this and had a rock here, and then he tipped it over twice. He pulled it over like this. Q. And how long did he leave it over? Did he leave it tipping over a while? A. Oh, about five seconds, I guess. Q. Long enough for quite a bit of liquid to run out of it? A. Oh, not so very much. Just enough for it to run out on the side. Q. Did it run down to the ground? A. No, I couldn't say that it did. Q. And then did it catch fire? A. Yes. Q. All that that had run out caught fire? A. Yes. THE COURT: The first time? A. Yes. Q. And was that the time when he said then, he said, 'See what I can do'? A. Yes. Q. And then what did he do that time? A. Well, he took two rocks, one rock like this, and then one back there, and he tipped it that way."

Later, the witness was interrogated by the court as follows:

"Q. Arley, just so the record will show:—I don't know whether it does or not—your brother was down in the ditch, pulling the flare towards—twisting it,—turning it, tipping it right toward him? A. Yes. Q. Is that correct? A. Yes. Q. And now after he caught fire, the flare went back in the position that it is now? A. Well, it never went in the same position, but it was almost in the same. Q. It was almost straight up? A. Yes, it was straight up, but it was not in the same place, I mean. Q. Well, it was straight up? A. Yes."

Loren Hooper, about the same age as the deceased, testified:

"Q. . . . Tell these people here—that is the jury—just tell how it happened and what you saw. . . . A. He was melting the tar and it was about eight inches away from the side of the ditch, and he pulled

it half way over and then started to melt the tar and it came over the rest of the way and hit the side of the ditch and then it exploded. Q. Why do you say it exploded? A. Because when it hit the side of the ditch it went PUFF! like that. Q. What do you mean, a flame or—it went out like that? PFF! A. No, it was a flame. Q. A flame. Where was Lyle with reference to it when that puff came out? A. He was right in front."

No watchman was maintained on the trench while the work was in progress, and the city admits knowledge of the fact that children were accustomed to play in the street.

While the report cards of the school attended by the deceased show that he did not hold a high rating in his studies, his father testified that he was of average intelligence for his age. He had been cautioned by his parents the day before the accident to keep away from the lighted flares.

The appellants' assignments of error raise the basic question whether the evidence produced by them was sufficient to make a *prima facie* case, requiring submission of the issues of negligence and contributory negligence to the jury.

██ They first urge, with great earnestness, that the city is chargeable with negligence under the doctrine of *res ipsa loquitur*.

Both appellants and respondent cite an article in the Washington Law Review, Vol. XIII, p. 215, in which the decisions of this court and the courts of other jurisdictions bearing upon the doctrine are collated and reviewed. The author states two rules, deducible from the authorities, which we think applicable here. One rule is to the effect that,

"Where the injury was the result of the way in which the instrumentality was used, then, if the plaintiff was

the actor, control was in him, and *res ipsa loquitur* will obviously be inapplicable."

The other is that,

"Once the actual cause of the injury is established beyond controversy, of course, whether by the plaintiff or by the defendant, no presumptions will be involved."

Whether or not the respondent was negligent in maintaining the lighted flares, under the circumstances of the case, is a question we shall later discuss. But, clearly, the negligence of respondent cannot be predicated upon the rule of *res ipsa loquitur*.

The immediate cause of the accident resulting in the child's death is not left in any doubt by the appellants' own witnesses. The quoted testimony shows that the accident was brought about by the child's own intermeddling with the lighted flare pot. It was one of the nine flares of the same type burning along the trench, placed there to give notice of danger. Even if it be assumed, as contended by the appellants, that the instrumentality had not been recently inspected, there is no inference from the evidence that the failure to inspect was the cause of the accident.

The eye-witnesses referred to an explosion, a "puff." It is clear from their testimony that the explosion or "puff" was from the ignition of the kerosene which had spilled out of the flare pot when it was tilted over by the deceased. The flare pot, offered in evidence by the appellants, is of a type in common use. The body of the pot is a dome-shaped container for kerosene, with a broad flat bottom about seven inches in diameter. It has an opening at the top, into which is inserted a ring loosely resting on a flange. The wick, drawn up through this ring, is protected from wind by a covering or cap, closed at the top, but with openings underneath through which the flame escapes. The

cap is not screwed onto the pot by threads, but is kept in place by flanges which fit into a groove when turned slightly to the right or left. An iron chain, nine inches long, is fastened to the top of the cap for carrying the flare.

It is apparent that the cap could come off with comparatively little manipulation, but, even so, the flame would continue to burn unless the pot was tilted to such an angle that the ring holding the wick would fall out. It was testified that, after the accident, the ring for holding the wick was found some fourteen inches away from the pot, which remained upright, and that the cap to which the chain was attached was found in the ditch.

As we have seen, the court, in order to interpret for the record the testimony of Arley Clark, inquired of him if the fact was that his brother was down in the ditch, "pulling the flare towards—twisting it,—turning it, tipping it right toward him?" To which the witness gave an affirmative answer. This furnishes the obvious explanation for the loosening of the top and the displacement of the ring holding the wick.

But whether the flare pot was accident-proof or not is apart from the issue. No harm could have come to the deceased if he had not himself intermeddled with it.

This brings us to the second ground upon which the appellants predicate negligence, namely, that the burning flares were an attractive nuisance to children playing in the street.

In *Heva v. School Dist. No. 1*, 110 Wash. 668, 188 Pac. 776, 9 A. L. R. 267, an action was brought against a school district to recover for damages sustained by a minor, twelve years of age, who had climbed to the roof of a school building by means of a fire ladder maintained on the building. In descending, he tripped

and fell to a fire escape landing below, causing the injuries complained of. A jury returned a verdict in favor of the plaintiff. It was set aside by the court and a judgment for the defendant entered *non obstante veredicto*. Affirming the judgment, the court said:

"Common objects, the uses and dangers of which are obvious and well known, at least to the normal child of twelve years, and which cannot be made inaccessible without destroying the purpose for which they exist, may not, under the law as established in this state, be found to be attractive nuisances simply because injury from their use has occurred to a licensee or trespasser of sufficient age and understanding to appreciate the danger."

It is a matter of common knowledge that open flares of the type used here are in general use on city streets, as well as country highways, to give warning of danger where work is in progress. The city was under a legal duty to warn against the open trench and, to that end, employed an instrumentality in common use. It may be that an open flare has some attraction for children; on the other hand, it brings home to them strongly the possibility of danger. The city was faced with a dilemma. The trench required the use of lights involving, it may be, some measure of danger. The almost certain risk of injury from an open, unguarded trench in a public street would be greater than the risk involved in the maintenance of the lights. The utility of the lights in guarding the ditch outweighed the danger of their use.

In passing upon facts differing from those present here only in that the burned child was two years of age and lanterns were used rather than open flares, the supreme court of Minnesota, in *Brown v. Minneapolis,* 136 Minn. 177, 161 N. W. 503, said:

"Defendant was in duty bound to light these trenches with red lights at night. It set the lights in about the

usual way. It cannot be said that it was negligence to set them when the men quit work instead of sending some one back at dark for that purpose. There were small children in this neighborhood, but in this respect it was no different from any other residence locality. The city could not be required to place or secure such lights so that children could not reach or disturb them. It is not easy to see how the city could do so and still have them serve their purpose.

"A lantern is some attraction to a child and involves some danger, but we cannot regard a common lantern as being of such attraction or such an inherent danger as to bring the case within the rule of the class of cases known as 'turntable cases.'

"We think there was no negligence on the part of defendant in placing this lantern upon the pile of sand at the end of the trench."

Since respondent was not chargeable with primary negligence, it is unnecessary to discuss the question whether the deceased was sufficiently mature to be chargeable with contributory negligence.

The judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.