**Arthur BRONSON, Jr., II, by etc.,**
Respondent,

v.

**KANSAS CITY, Missouri, a Corporation,**
Appellant.

No. 22884.

Kansas City Court of Appeals.
Missouri.
April 6, 1959.

Benj. M. Powers, City Counselor, Thos. J. Conway, Jr., Asst. City Counselor, Kansas City, for appellant.

Roger J. Barbieri, Kansas City, for respondent.

HUNTER, Judge.

This is an appeal by defendant, the City of Kansas City, from a $2,500 judgment in favor of plaintiff, Arthur Bronson, Jr., II, a minor in a suit brought by his mother and next friend, Helen O. Bronson. Plaintiff, 4½ years old, was burned by a flare pot placed by the City to warn of an excavation in the public sidewalk in front of plaintiff's home. The only point raised by defendant City on this appeal is that the trial court erred in overruling its motion for a directed verdict at the close of plaintiff's evidence and at the close of all the evidence for the reason that the use of flare pots by the City to guard excavations is not negligence.

By proceeding to put on its evidence after the trial court overruled its motion for a directed verdict at the close of plaintiff's evidence, defendant waived that contention of error and preserved only its contention that the trial court erred in overruling its motion for a directed verdict at the close of all the evidence. Lindsay v. McLaughlin, Mo.App., 311 S.W.2d 148, 149.

In ruling on the question of whether all the evidence made a submissible case for the jury the appellate court must take as true every fact and circumstance favorable to plaintiff which the evidence tends to prove, and give to plaintiff the benefit of all reasonable inferences which may be fairly drawn therefrom. Capra v. Phillips Investment Co., en Banc, 302 S.W.2d 924. Thus, plaintiff is accorded the benefit of any part of defendant's evidence favorable to him and not contradicted by plaintiff's own testimony or not contrary to plaintiff's fundamental theory of recovery. Catanzaro v. McKay, Mo.Sup., 277 S.W.2d 566, 568.

We proceed to set out the evidence favorable to plaintiff.

Approximately a week to two weeks before May 11, 1955, defendant City was engaged in the process of removing broken sidewalk from the 2600 block on Wabash Street, including two slabs in front of plaintiff's home at 2622 Wabash Street. The City employees would take up the broken concrete from a particular section or slab of the sidewalk. They would not immediately refill that section or slab with fresh

concrete. Their practice was to leave it unfilled until enough slabs were removed and ready for new concrete to require at least three or more yards of cement because "it was cheaper" that way. Since each slab is only about 5 feet wide, 6 feet long, and 4 or 5 inches deep, and as a lot of tree roots in this particular block had to be cut out some delay resulted. Further, it was not considered feasible to pour cement while it was raining or if there was an accumulation of water in the place where the slab had been removed. Sometimes the problem from such an accumulation of water was solved by using sand to soak it up.

Approximately twenty-five children lived in this particular block. Quite a few of these children were under the age of 10 and approximately 15 of them were under the age of 5. All these children customarily played on the sidewalk in the block and they continued to play there during the time that the work of repairing the sidewalk was taking place. This fact was well known to the City employees engaged in the repair work. Upon several occasions when the children crowded around them to watch them work these employees would "shoo" the children away if the children bothered them.

At this particular time it was the practice of the City in order to warn of excavations to use some type of warning light and an accompanying barricade. The City had both flare pots and red lanterns available for that use. Its witness, Boyd L. Ludlow, Safety Supervisor of the Public Works Department, testified that generally the City would use the flare pots because there was more vandalism and loss in connection with the use of red lanterns and the flare pot was less likely to blow out from the wind. He also testified that it was the practice of the City to leave the flare pots burning both night and day rather than have them burning at night only. He stated that this practice permitted the flare pots to be serviced only once every 24 hours whereas if they were kept burning only at night it would require servicing them twice a day; once to put them out in the morning, and once to light them again in the afternoon.

One City employee, Charlie Vestal, had the duty of transporting all lights and barricades to the places needed and the number of lights so delivered varied from 75 to 150 a day throughout the City. His instructions by the City were to keep them burning day and night continuously. His practice was to pick up the empty flare pot each day from the particular job and to replace it with a fresh one. If the work crew wasn't present he replaced them and lit them; but if there, he just picked up the empty flare pot and left a full one which the work crew was to light when they left that evening. In May, 1955, it was his practice to start on his route about 7:00 a. m. and to keep at it all day. His records indicated he placed flares in this block commencing May 3rd and picked them up for the last time on May 9, indicating no further need or use for them thereafter. He also worked with red lanterns and had some available for use at that time.

According to Mr. Ludlow the reason why the flares were left burning during the day was not that they were needed to mark or warn of the excavation which would be visible and also be marked by some sort of barricade but because the City would have the extra cost of servicing them twice a day, requiring an additional employee or two and the expenditure of more work time. He stated this was the only reason these flare pots were kept burning during the day. Flare pots are not any more readily seen in the daytime than any other light.

The red lanterns had an enclosed flame. The flare pots, approximately 7 inches in diameter, had an open flame which emanated from the top and tended to go out each side. Ordinarily, the flame would be of a height of about three inches. It would be affected by the wind. Ordinarily even in a wind the flame would not get beyond the circumference of the pot.

Defendant presented the testimony of an engineer with the Gas Service Company to

the effect his company started using flare pots about 1951 or 1952, and that they also used red lanterns. They used red lanterns more than flare pots but were going more to flares because they were very seldom tampered with or stolen since they are dirty and hot. His company permitted the flares to burn day and night to save the labor and cost of going by each morning and turning them out and each evening to light them up again. Defendant's witness, John Thompson, Superintendent of a local construction company, testified it was the custom of contractors in Kansas City in 1955 to use either the red lanterns or flare pot and a barricade to guard excavations and they let the flare pots burn around the clock to save the expense of turning them on and off.

Earl Miller, concrete finisher foreman for the City, who was in charge of and worked on the concrete slabs in front of plaintiff's home, testified it would not require even half a day to take out the two sections of sidewalk in front of plaintiff's home and cut out the tree roots there. When the concrete is poured it dries in approximately 24 hours. His practice is to endeavor to pour the fresh cement around 10:00 a. m. and to take the barricades off the next day. Part of his duties was to determine the type of barricade and the number of lights to use when a sidewalk is excavated and to put up the barricades and lights. Mr. Vestal merely left whatever lights and barricades he told him to leave.

The type of barricade Miller chose for this location was an "A frame" with a 2 x 4 about 4 feet long that goes into this "A frame". His crew dug out the broken concrete from two slabs in front of plaintiff's home. One slab was to the south, about at plaintiff's extended south property line and the other slab was approximately 15 feet to the north of that slab. He placed one "A frame" at the south edge of the south section of the removed sidewalk and the other "A frame" at the north edge of the north section of removed sidewalk. This left three open sides at each of the two excavations, and even where placed the "A frame" did not serve as a solid barricade but rather provided only a single 2 x 4 that sloped down to the sidewalk. He also placed one flare pot in the middle of each of the two excavations.

During this time other excavations in that block on both sides of the street were also made and flare pots were put in them. The City employees did not work every day during that time. The concrete in front of plaintiff's house was not poured until the day after the accident, and it took only a few hours to pour it.

Numerous neighbors of the plaintiff testified that they did not see any barricade or other barrier or planks of any type near the two excavations in front of plaintiff's home. Several did see boards lying flat on the sidewalk near them. Several mentioned that they saw the "A frame", but it was not a barricade and it fell down easily and someone had to set it up again.

Mrs. Hazel Keller, 2620 Wabash, lived with her husband and three young children next door to plaintiff. It was cloudy and windy the day of the accident. She was in her front bedroom, upstairs, and heard a child scream. This occurred "very early in the afternoon or probably late in the morning". She looked out and saw her son (the same age as plaintiff) and Arty (plaintiff) by these pots the workmen had left burning on the sidewalk in front of plaintiff's home.

She went downstairs, and out the front door and saw that it was Arty whose pants had caught on fire. She went to him as fast as she could, put the fire out on his pants' leg and carried him into her house. His left pants' leg was burning when she reached him. There was no other fire around except that from the flare pots.

Mrs. Keller testified that the flare pots had been on the sidewalk about two weeks and had been lit continuously day and night including windy days. She located the particular pot involved as being six or

eight feet from where plaintiff's stairs came down to the sidewalk, right in the middle of the sidewalk, six feet from the curb, in front of plaintiff's house. She was asked how high the flame from the flare pot was:

"A. I would say this particular day they were very high, about—oh, maybe as much as six inches. Then it was an extremely windy day and at times the wind would catch that flame and blow it maybe a foot away from the pot. I had watched it from my home, being concerned not only for my children but for the other children in the neighborhood, and there were at least two dozen small children (under 12) who play up and down the sidewalk all day (and were playing there the day of the accident) and I had seen the flames shoot out—oh, at least a foot away from the pot during the day. * * * It was a very windy day. * * * I noticed how strong the wind was blowing and how it was blowing the flame out. You know, just made it shoot (indicating) from the pots." The flame would just shoot out at an angle.

Mrs. Keller had observed the smaller children, those under 10, playing around the pots on other occasions and had chased them away. " * * * The older children * * * those who were in high school — you could hear them during the day telling the kids to stay away from it. Children that age, you tell them a thing over and over again, and they don't seem to understand."

There was no guard around the flare pot. There was "some kind of a wooden horse" on one side near it. "I would say the pots had been there for at least two weeks at the time of the accident." "Q. You didn't actually see any contact between Arthur Bronson and this flame that you described? A. No, but there was no other flame there. Q. Where was Arthur when you first saw him? A. He was standing there about a foot away from this flame, or pot, or whatever you want to call it

* * * They were on the sidewalk, now whether in the excitement, whether they were in the part that had been dug up or cracked, I don't know."

Plaintiff's mother did not witness the accident but she and other mothers in the block had upon numerous occasions warned the children, including plaintiff, of the danger from the flare pots. These flare pots seemed to attract the children, and they did observe the children upon several occasions crowding around them. The afternoon of the accident her son, Arthur, and his little friend from next door were playing in plaintiff's fenced backyard shortly before the accident. The next thing she knew was after Arthur was burned. It was not raining that afternoon when plaintiff was injured; nor had it rained earlier that day.

Robert Babb, Meteorologist for the United States Weather Bureau, testified for defendant as follows: May 2, 1955, no precipitation; May 3rd, a trace only; May 4th, none; May 5th, none; May 6th, .14 inch precipitation; May 7th, .54 inch which he stated is considered "light" ; May 8th, trace; May 9th, .25 inch; May 10th, .09 at 1:00 a. m.; May 11th, .56 inch, no measurable amount prior to 4:00 p. m. (light); wind velocity 12 m. p. h. that day.

█ It is the duty of defendant City as a municipality to exercise ordinary care to keep its sidewalks in a reasonably safe condition for the use of the public including children. Schaefer v. Kansas City, Mo. App., 270 S.W.2d 84, 86; Keen v. City of St. Louis, Mo.App., 189 S.W.2d 139, 142. This includes the duty if a sidewalk gets out of repair to cause the sidewalk to be repaired within a reasonable time. Lithegner v. City of St. Louis, Mo.App., 125 S.W. 2d 925, 929.

█ Likewise, it is the duty of a municipality to exercise ordinary care toward children using its sidewalks for recreation and play. Thus, the action taken by the municipality to bring about these repairs,

and the accompanying precautions taken, as by using barricades, warning lights or flares must not result in the negligent injury of children or others.

■ While the duty owed is that of exercising ordinary care it is well recognized that where children are concerned the exercise of ordinary care requires the exercise of more vigilance and caution than might be sufficient with respect to an adult. Hammontree v. Edison Bros. Stores, Mo.App., 270 S.W.2d 117, 125; Kemp v. Doe Run Lead Co., Mo.App., 57 S.W.2d 758; Doran v. Kansas City, Mo.App., 237 S.W.2d 907; Holmes v. Missouri Pacific R. Co., 207 Mo. 149, 105 S.W. 624; 65 C.J.S. Negligence § 12(b), page 400. This is because children cannot and do not ordinarily exercise the same degree of prudence and care for their own safety as adults. The City, held to the standard of a reasonable man, is presumed to know this and to govern its actions accordingly.

■ The care necessary to avoid causing children injury increases with their inability to protect themselves from their childish ignorance, indiscretions, instincts and impulses, and must be proportionate to their maturity and capacity. Conduct which might reach the standard of ordinary care with respect to an adult might in the case of a child amount to negligence, or even gross negligence, since the ability of a child to exercise care and prudence for his own safety increases as he grows older. The age of the particular child is, therefore, always a matter for consideration in determining whether ordinary care has been exercised to avoid injuring him, and conduct may be negligent with respect to a very young child, although it might reach the standard of ordinary care with respect to a child who had reached the age at which children are ordinarily more able to appreciate and avoid danger. See, 65 C.J.S. Negligence § 12(b), page 401.

While the issue is not before us in this case, it is noteworthy that our Supreme Court has indicated that a four year old child is not to be charged with contributory negligence. Schmidt v. Allen, Mo., 303 S.W.2d 652; Also, Cases, Negligence, ☞ 85; 65 C.J.S. Negligence § 145, page 785; 38 Am.Jur., Negligence, sec. 40, page 685.

■ Thus, ordinary care is a relative term, and the known characteristics of children must be taken into consideration in determining whether or not sufficient care for the safety of the child has been exercised in a particular case.

■ It is also the rule that the care to be exercised in a particular case must be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question. See, Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223, 227; 65 C.J.S. Negligence § 11(2), page 396.

As stated in Sirounian v. Terminal Railroad Ass'n of St. Louis, 236 Mo.App. 938, 160 S.W.2d 451, 454; " * * * What is ordinary care in a given instance, that is, such care as an ordinarily prudent person would be expected to exercise under the same or similar circumstances, must depend upon the circumstances and be measured by the exigencies of the particular situation. In other words, ordinary care is not in all cases a fixed legal standard which the court may arbitrarily apply, but on the contrary, it is a relative term depending upon the character of the act or business of the one charged with the duty, and the relation he bears to the person to whom he owes the duty."

■ The decisive question presented on this appeal is, reviewing the evidence in the light most favorable to plaintiff, and according him the benefit of all reasonable inferences therefrom, are facts presented from which a jury composed of reasonable men could find that defendant City breached its duty of ordinary care which it owed to plaintiff. For the law is well settled that the court should never withdraw a question from the jury unless all

reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue. Lucas v. Barr, Mo. App., 297 S.W.2d 583, 585; Brandt v. Thompson, Mo.Sup., 252 S.W.2d 339; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628.

Some of the more important factors in the case before us that bear on the question of whether or not defendant failed to exercise its duty of ordinary care to plaintiff are: (1) Plaintiff's extreme youth; (2) The knowledge of defendant that very young children played daily on the sidewalk near the flare pot; (3) The need, if any, for any type of warning light in daytime; (4) The selection of the flare pot with its open flame that ordinarily even in a wind would not go beyond the circumference of the pot but which was seen on this occasion to go out "at least a foot"; (5) The availability of red lanterns with enclosed flames; (6) The decision of the City for economy reasons only to let the flare pots burn all day long in a vicinity where young children played; (7) The decision of the City for economy reasons only to prolong the use of the flare pots until enough slabs of sidewalk had been removed to require at least 3 yards of cement to refill them; (8) The delay of the City in refilling the dug up portions of the sidewalk on the suggested ground of prevention by rainy weather in view of the evidence concerning when and how much it rained; (9) The type of barricade used and its placement.

After considering the record before us and giving plaintiff the full benefit of all the favorable evidence and inferences reasonably to be drawn therefrom we are unable to say as a matter of law that reasonable men could not find that defendant City failed in its duty to plaintiff to exercise ordinary care for his safety.

In Knox v. City of Granite Falls, 245 Minn. 11, 72 N.W.2d 67, 53 A.L.R.2d 1091, a seven year old girl was burned by a kerosene flare (similar to our flare pot) set out in the public street to warn of an excavation. That court stated that under the circumstances of the case the use of such flares involved an unreasonable risk of serious bodily harm to young children known to play in the vicinity and the utility of maintaining the flares was outweighed by the danger involved. The court held that the trial court properly submitted the issue of defendant's negligence to the jury. In so holding the court stated, 72 N.W.2d loc. cit. 71, "* * * We are of the opinion that open flares of the type used in the instant case do involve a risk of danger which a child might well not appreciate. * * * The municipality is, of course, obligated to maintain adequate warning devices to protect the public from excavations and other dangerous areas in the streets. In the case of Clark v. City of Bremerton, 1 Wash.2d 689, 696, 97 P.2d 112, 115, relied upon by the defendant here, the court concluded that 'The utility of the lights in guarding the ditch outweighed the danger of their use.' We are of the opinion that this conclusion, at least as applied to the facts of the instant case, is unsound. Obviously there is no necessity for maintaining illuminating devices during daylight hours. However, we need not consider the question of whether the defendant here failed to extinguish the flares within a reasonable time after daybreak. Regardless of the time of day involved, where the municipality can reasonably use types of warning devices that do not involve the danger inherent in open flares, there is little if any utility in maintaining the latter. We are not impressed by defendant's argument that a safer warning device is not available. It is common knowledge that there are other devices, such as glass-enclosed flares or battery-operated lights, which offer a considerably less dangerous yet equally effective means of providing a warning. Clearly the danger in using open flares can be obviated when the cir-

cumstances warrant without any onerous burden or undue inconvenience being placed upon the municipality."

In Gilligan v. City of Butte, 118 Mont. 350, 166 P.2d 797, 801, the complaint alleged that a 5 year old child, resided in a densely populated area where children of tender years were in the habit of playing on the streets, especially in daylight hours, all of which would have been known to the City by the exercise of reasonable care; that the City by exercising reasonable care should have known that lighted flares left burning on the street in the daytime constituted a danger to children of tender years, and that the child was injured by her dress becoming ignited by the open flare. The Supreme Court of Montana held that the complaint stated a cause of action against the City. In so holding the court said: "While a city is not an insurer against accidents yet the law imposes upon it the duty of guarding against such dangers as can or ought to be anticipated or foreseen in the exercise of reasonable prudence and care. Remesz v. City of Glasgow, 95 Mont. 595 [598], 28 P.2d 468. Where alluring instrumentalities of an inherently dangerous character have been placed in a street whereon children may be reasonably expected and whereon they habitually play, a high degree of vigilance is necessary to constitute ordinary care. As is said in Schmit v. Village of Cold Spring, supra (216 Minn. 465, 13 N.W.2d [382] 384 [154 A.L.R. 1325]), 'If a person of ordinary prudence ought to anticipate from his acts or omissions injury to someone to whom he owes a duty, then it is negligence on his part to so act. If from the negligence an injury flows in unbroken sequence as a natural and probable consequence, liability follows.' "

In Schmit v. Village of Cold Spring, 216 Minn. 465, 13 N.W.2d 382, 384, the action was for damages for personal injuries to a six year old boy who was burned by an open flare (of the same type as our flare pot) placed as a warning in front of an open trench in one of the City's streets. The court held that the question of negligence on the part of the City was properly submitted to the jury, stating: "The evidence in the case at bar shows that the accident occurred in an unimproved residential street in a small village. It tended to prove that there were a large number of small children in the neighborhood; that for several weeks, as the work progressed, they had played in the street and around the sand pile caused by the excavation; and that they had gathered like 'flies' around the open flares after the workmen left. From this evidence the jury could well conclude that the village officers were chargeable with knowledge of the children's habit of playing around the flares and should have reasonably anticipated some injury to them. Consequently the jury was justified in its verdict."

The court in the Schmit decision distinguished the case of Clark v. City of Bremerton, 1 Wash.2d 689, 97 P.2d 112, relied on by appellant by saying: "The court there held that there was no liability and said: 'The quoted testimony shows that the accident was brought about by the child's own intermeddling with the lighted flare pot.' There is no contention here that the plaintiff was negligent as a matter of law, so the Washington case is not helpful."

Appellant also relies upon the cases of Conrad v. City of Takoma Park, 208 Md. 363, 118 A.2d 497, and City of Grand Junction v. Lashmett, 126 Colo. 256, 247 P.2d 909, 912. In the Conrad case the petition was found to lack a sufficient allegation of specific facts to show a duty owed to the injured child and its breach by defendant City. The court held that it is not negligence per se to place an open flame upon the highway for warning purposes. In the City of Grand Junction case it was acknowledged that the six year, 9½ month old child involved "fully recognized the danger from fire." Neither case involved flames placed upon public sidewalks, and

each differed from the instant case in other material respects as their examination will disclose. We are not persuaded that they should cause us to reach a result contrary to that which we have expressed earlier in this opinion.

For the reasons stated we hold that the trial court did not err in overruling defendant's motion for a directed verdict at the close of all the evidence.

The judgment is affirmed. It is so ordered.

All concur.