[No. 28844. Department One. January 19, 1943.]

MARK S. WHITE, *et al.*, *Respondents*, v. MARGARET C. SPLAWN, *Appellant*.[1]

*Snively & Bounds* and *Homer B. Splawn*, for appellant.

*LaBerge & Lyon*, for respondents.

MALLERY, J.—The plaintiffs sue to recover damages for the death of thirty of their cattle and injury to others, for veterinary bills, and expense of additional labor, resulting from their eating of weeds and grasses

[1]Reported in 133 P. (2d) 298.

which had been negligently sprayed with poison by the defendant on her farm.

In the spring of 1941, the parties entered into a written lease, whereby the defendant leased to the plaintiffs for the season of 1941 her ranch property in question, located in Cowiche valley. The lease excepted certain pasture lands, and also provided:

"It is expressly agreed that said lessee shall not permit or suffer any livestock on said premises except such as may be necessary for his performing the covenants of this lease, and except upon the pasture land rented and *except on the stubble land after the crops are removed or fenced.*" (Italics ours.)

Shortly thereafter and continually throughout the spring and summer, there arose differences and difficulties between the parties. Their relationship as lessor and lessee was characterized by considerable friction.

In the fall of the year and after the grain had been harvested, the plaintiffs constructed "temporary fences" between two alfalfa fields and the grain stubble lands, and along the west side of a ditch which extended from the southwest corner of the "upper stackyard" in a southerly direction to the orchard, where it connected with the fence which the plaintiffs had previously erected around the orchard. This fence along the ditch consisted of two strands of barbed wire hung on posts or stakes, which were driven in the ground at uneven distances from twenty to thirty feet apart.

A controversy arose between the parties as to whether or not, under the terms of the lease, plaintiffs were entitled to graze their cattle upon the alfalfa lands after the removal of the third cutting of alfalfa. The defendant contended that the above-quoted covenant of the lease referring to "stubble land" applied only to the grain stubble. The plaintiffs contended

that the term "stubble land" referred not only to the grain stubble, but to the alfalfa stubble left after the third cutting, and so notified the defendant by a letter dated October 17th. On the next day, the defendant had prepared a notice of termination of lease, which was served upon the plaintiffs on October 20th.

On November 3rd, the parties hereto, with their respective attorneys, had a conference, in which plaintiff claimed the right to pasture the alfalfa stubble. The plaintiffs and their employees, on that day, removed the wires from the fence located along the ditch, but left the stakes standing. On the same day, defendant drove seven head of plaintiffs' cattle out of the orchard.

Defendant, on the morning of the next day, November 4th, purchased a small drum of Triox, a weed poison containing an arsenic base, at the Beard-Adams Feed Store, in Yakima. She was notified that this preparation was dangerous to animals. The container was posted with stickers which stated that Triox was poisonous and displayed the conventional skull and crossbones. Defendant admitted knowing that Triox was poisonous to cattle. She returned to the ranch, and about two o'clock that afternoon, with the help of two of her employees, commenced to spray the Triox, which is a metallic salt attractive to cattle, on the weeds growing along the west side of the ditch where the fence, which separated the west field of alfalfa from the grain stubble lands, had been removed.

Afterwards, seeing the cattle in the poisoned area, she went home and attempted twice to call the plaintiffs on the phone to warn them of their peril. The phone was busy each time, and she did not interrupt those speaking to ask for the use of the line or attempt to call again. She then drove the cattle out of the danger zone, but did not secure them or send her employees to do so. She then returned and went to bed

and nothing further was done to safeguard the cattle. Most of the cattle that ate the poison died thereof; the remainder were injured.

The trial court resolved the question involving the lease against the plaintiffs and held that the term "stubble land" did not include the alfalfa land. Therefore, the plaintiffs had no right to remove the fence, and their cattle consequently were trespassers. However, the court found that the defendant knew the Triox was dangerous to cattle, and that she knew, or should have known, that the prior removal of the fence made it accessible to them. The court further found that the defendant did not take reasonable measures to safeguard the cattle after she had put them in peril. Judgment was given for the plaintiffs. Defendant appeals.

We will assume, without deciding (because it is not necessary to our decision to do so), that the cattle were trespassers. It is a time-honored principle of the common law that, while an owner of property owes no duty to trespassers of maintaining his premises in a safe condition or of guarding them against harm, nevertheless, when their presence upon his land is known, he may not thereafter actively injure them with impunity, simply because they are on his land. The affirmative acts of the owner, after the trespassers' presence is known, need not be done with the purpose of injuring the trespasser in order to make him liable. It is enough if a reasonable and prudent person would know that the act would likely cause the injury, and would have refrained from doing it. The trial court correctly concluded that the defendant breached her duty in the circumstances.

The judgment is affirmed.

MILLARD, J., concurs.

JEFFERS and STEINERT, JJ., concur in the results.

ROBINSON, J. (dissenting)—I regard this as a complicated and difficult case, especially on the law side. To several of the many legal contentions made by appellant, all of which have been elaborately argued, both orally and in writing, I have been unable to find answers which to me seem wholly satisfactory. I find none in the opinion, and, accordingly, cannot assent to the disposition it makes of this appeal.

ON REHEARING.

[*En Banc.* March 20, 1943.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the opinion heretofore filed herein.