# LEONARD DUNN v. RALSTON PURINA COMPANY et al.—272 S. W. (2d) 479.

Middle Section.  July 30, 1954.

Petition for Certiorari denied by Supreme Court, November 16, 1954.

230

E. C. Templeton and R. W. Stevens, both of Fayetteville, for plaintiff in error.

Holman, Holman & Matthews and Simms & Simms, all of Fayetteville, for defendant in error.

FELTS, J.   Plaintiff sued Ralston Purina Company and its local dealer, Walter J. Tanner, for $3,000 damages

for the loss of his horse, which he charged was caused by their negligence in that they manufactured a livestock feed called Omolene, represented it to be fit and good for the horse, induced him to buy and feed it to the horse, when in fact it was unfit, spoiled, and so injurious that when fed to the horse it killed him.

There was a verdict and judgment for plaintiff against the Company for $1,500, and a verdict and judgment in favor of Tanner. Upon the Company's motion for a new trial the Trial Judge, concluding he had erred in not granting the Company's motion for a directed verdict, entered a judgment for it as on a directed verdict.

Plaintiff moved for a new trial and to reinstate the verdict and judgment for him. His motion was overruled, he appealed in error, and insists that the evidence was adequate to make a case for the jury and to support the verdict for him, and that the Trial Judge erred in directing a verdict for the Company.

It appears the Trial Judge directed a verdict for defendant Company upon these grounds: (1) that there was no evidence of any negligence on its part; (2) that there was no evidence of any causal connection between any act of the Company and the death of the horse; and (3) plaintiff was guilty of contributory negligence as a matter of law. And learned counsel have debated these questions here.

In considering these issues, and in testing whether a verdict should have been directed for defendant, we must construe the evidence most favorably to plaintiff, take as true that which supports his rights, discard all countervailing evidence, and indulge all reasonable inferences in his favor. Smith v. Sloan, 189 Tenn. 368, 376-377, 225 S. W. (2d) 539, 227 S. W. (2d) 2.

Evidence for plaintiff was that he was a farmer raising Tennessee Walking Horses, and had a highbred young horse, Little Go Boy, which he was preparing for the coming National Walking Horse Celebration. The Company sent its field man and its salesman to plaintiff's farm and they represented to him that Omolene was the best possible feed for this horse. Relying on their representations, he bought from its local dealer, Tanner, a 100 lb. bag of Omolene which the Company had manufactured and shipped to Tanner.

He bought this bag August 6, 1951 and on the next day began to feed the Omolene to his horse. He fed the horse at about 5:00 p. m., August 8, and about two hours later he found the horse was violently ill, down, rolling in the stable. He called Dr. Bullington, a veterinarian, who treated the horse for three or four hours, but to no avail. The horse died about midnight. Dr. Bullington and another veterinarian called as witnesses for plaintiff testified that in their opinion the horse died of acute indigestion or colic caused by the bad condition of the Omolene.

Plaintiff reported the matter and Tanner and a salesman of the Company took samples of this bag of Omolene and of another bag of the same lot in Tanner's store. Both samples were found bad. The Omolene had gone through a heat and had spoiled. While the formula was not disclosed, it was shown that the Omolene contained No. 2 yellow corn, oats, blackstrap molasses, and other protein materials. The word "heat", as here used, is defined as "high temperature produced by fermentation or putrefaction"—Oxford Dictionary.

While there was sharp dispute in the evidence as to whether this Omolene was toxic or could kill a horse, it was undisputed that the Omolene had gone through a

heat, spoiled, and was unfit for horses; and evidence for plaintiff was that it was not only unwholesome but was "apt to give a horse colic" and likely did cause the death of this horse.

Evidence for defendants was that this bag of Omolene was part, of a batch of Omolene manufactured by the Company at its Nashville Plant on August 1, and there put into bags which were closed and securely sewn, and a number of them were shipped to the local dealer Tanner on August 2. They were not opened or altered by anyone from the time they left the Company until this bag reached plaintiff.

■ These facts, we think, were sufficient to put a duty of care upon the Company toward plaintiff. It is true there was no such duty on a manufacturer, in the absence of privity, under the so-called general rule of non-liability which was applied in Burkett v. Studebaker Bros. Mfg. Co., 126 Tenn. 467, 150 S. W. 421, and like cases.

But it can hardly be said that such a general rule any longer exists. It has been discarded in England (Grant v. Australian Knitting Mills, [1936] A.C. 85, 105 A. L. R. 1483), and in the United States the exceptions have swallowed up the rule. Carter v. Yardley Co., 319 Mass. 92, 64 N. E. (2d) 693, 164 A. L. R. 559, 568; Wagoner v. Ford Motor Co., Tenn. Ct of App., July 28, 1945, unreported, noted in 19 Tenn. L. Rev. 800, reversed on another ground 183 Tenn. 392, 192 S. W. (2d) 840, 164 A. L. R. 364; Aurex Corp. v. Blair, Tenn. Ct. of App., Jan. 7, 1947, unreported, noted in 20 Tenn. L. Rev. 193; Wade, Book Review, 22 Tenn. L. Rev. 444, 447.

■ The rule now, in our opinion, is that where a product is such that, if negligently made, it may reasonably be expected to injure the person or property of an ultimate user of it, then, irrespective of contract, the manufacturer

is under a duty to such user to make it carefully. Grant v Australian Knitting Mills, supra, 105 A. L. R. 1494; Carter v. Yardley Co., supra, 319 Mass. 92, 64 N. E. (2d) 693, 164 A. L. R. 563; Prosser on Torts, 673-678; Noel, Products Liability of a Manufacturer in Tennessee, 22 Tenn. L. Rev. 985, 988-89.

This rule extends to a manufacturer of animal feeds, and such a manufacturer owes a duty to an ultimate user to use due care in making or supplying such feeds. Quaker Oats Co. v. Davis, 33 Tenn. App. 373, 232 S. W. (2d) 282; Prosser on Torts, 680; Ellis v. Lindmark, 177 Minn. 390, 225 N. W. 395; Seaton Ranch Co. v. Montana Vegetable Oil & Feed Co., 1953, 126 Mont. 415, 252 P. (2d) 1040; Burns v. Ralston Purina Co., 210 Ga. 82, 77 S. E. (2d) 739.

We think on the evidence the jury could find the Company breached its duty and was negligent. It made and packed the Omolene in closed bags, and shipped some of them to its dealer Tanner, who kept them unopened and unaltered, and sold one to plaintiff. This lot of Omolene was spoiled and dangerous to horses. These facts made a prima facie case of negligence against the Company. Quaker Oats Co. v. Davis, supra; Grant v. Australian Knitting Mills, supra; cf. Coca-Cola Bottling Works v. Sullivan, 178 Tenn. 405, 158 S. W. (2d) 721, 171 A. L. R. 1200.

It is urged for the Company, however, that it made this batch of Omolene one afternoon and shipped part of it to Tanner next morning; that by its tests this Omolene was in good condition when it left the Company's plant; that any deterioration it underwent was due to natural causes, and occurred after it left the Company's hands; and that therefore it is not chargeable with negligence therefor.

We cannot accept this argument. The Company's

responsibility did not end with its sale of its product to its dealer, or with the condition of the product as it left the Company's hands if it knew, or by reasonable care could have known, that, due to natural causes, the product, before it could be used, would likely become unfit and dangerous for the use for which it was sold.

It was shown by the evidence that the grain and the Omolene would quickly heat and "spoil" in hot, humid weather, especially when infested with grain mites; that all of these conditions prevailed and were known by the Company when it made this Omolene; and that it was experimenting on how to prevent its Omolene "going out of condition." After testifying to these matters, its Manager on cross-examination said:

"Q. And, even with all those precautions, you then realized you couldn't at that time of the year, that year, put out a product that was safe? A. No, I wouldn't say that. I say we couldn't put out a product that you could guarantee indefinitely to not go out of condition, any more than a grocer can sell you an apple and guarantee it won't go bad."

\* \* \* \* \* \*

"Q. And you went ahead and sold the public feed that summer that would go into heat and spoil within six or seven days, when you knew there was a grain mite crop that year, when it was unusually hot, and went on and sold it without any warning whatever? A. That is no different than when you are buying ice-cream. It will melt, depending on where you kept it."

Thus it appeared that though the Company knew Omolene would quickly spoil, like ice-cream, it nevertheless sold it, as fit for horses, without any warning of

such a probable defect; that it put out a product which was apparently safe, but which to its knowledge would likely spoil and become dangerous before it could be used for the purpose for which it was sold.

Moreover, the Company, through its agents, represented to plaintiff that Omolene was safe and fit and the best feed for his horse, and thereby induced him to buy and feed to his horse Omolene which had spoiled and become dangerous. Such conduct constituted negligence on the part of the Company. Burkett v. Studebaker Bros. Mfg. Co., supra, 126 Tenn. 472, 150 S. W. 421; Vaughn v. Millington Motor Co., 160 Tenn. 197, 201, 22 S. W. (2d) 226; Baxter v. Ford Motor Co., 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A. L. R. 521; Annotations, 17 A. L. R. 706, 39 A. L. R. 999, 63 A. L. R. 349.

We think the jury could well find that this negligence was the proximate or legal cause of the loss of plaintiff's horse. By it he was led to feed the horse the Omolene. On the second day the horse became violently ill and died in a few hours. Besides the Omolene, the horse had been given nothing but the oat hay and water which had been regularly fed to him and other stock of plaintiff without ill effects. This horse was the only one that was fed Omolene, and the only one of plaintiff's animals that became ill.

The Omolene was admittedly spoiled and unfit for horses; and in the opinion of the veterinarian who saw and treated the horse, and of the veterinarian who made the autopsy, this Omolene was dangerous, apt to give a horse colic, and likely did cause the death of this horse.

The Company contended that the evidence left the question of the cause of the horse's death unanswered; and the veterinarian called by it expressed that opinion, on the basis of the autopsy. It is true that the autopsy

did not show the ''knots and twisting of the intestines,'' a condition usually found in death from colic. But Dr. Byrd, who made the autopsy, said such a death could occur without that condition, and he agreed with the opinion of Dr. Bullington that the horse died of colic caused by the Omolene.

Whether this Omolene would cause colic, and what caused the death of this horse, were questions of medical science which could not be answered by the court or the jury without the aid of expert opinion; and the opinion of the two veterinarians, referred to, constituted substantial evidence to support the verdict of the jury. National Life & Acc. Ins. Co. v. Follett, 168 Tenn. 647, 653, 80 S. W. (2d) 92; Craig v. Marquette Cement Co., 190 Tenn. 234, 229 S. W. (2d) 148.

We think plaintiff was not guilty of contributory negligence as a matter of law. He put the Omolene in his barn and fed it to his horse believing it was safe and fit. He had a right to rely on the Company's representation to that effect. He did not become aware of the defect in the feed until after the horse died and the veterinarian looked at it. We think the question of contributory negligence was one for the jury. Carey Roofing & Mfg. Co. v. Black, 129 Tenn. 30, 36, 164 S. W. 1183, 51 L.R.A., N. S., 340; Osborn v. City of Nashville, 182 Tenn. 197, 203, 185 S. W. (2d) 510.

The judgment of the Circuit Court, entered as on directed verdict for the Company, is reversed and the case is remanded to that court for a new trial as to the Company. The costs of the appeal in error are adjudged against the Company. Future costs will abide the outcome.

Howell and Hickerson, JJ., concur.