**Clifford L. LA PLANT, Plaintiff-Respondent,**

v.

**E. I. DU PONT DE NEMOURS AND COMPANY, Inc., Defendant-Appellant.**
**No. 7872.**

Springfield Court of Appeals.

Missouri.

April 22, 1961.

Motions for Rehearing or to Transfer Overruled May 16, 1961.

**234**

Carl E. Geuther, Wilmington, Del., Hocker, Goodwin & MacGreevy and John P. McCammon, St. Louis, for defendant-appellant.

James V. Conran, Hal E. Hunter, Jr., New Madrid, for plaintiff-respondent.

STONE, Presiding Judge.

In this jury-tried action predicated on alleged negligence, plaintiff sued and pro-ceeded to trial against St. John's Levee & Drainage District (referred to as the Drainage District), Ollie Delaney, its supervisor, Cypress Supply Company (referred to as Cypress), and E. I. DuPont de Nemours and Company (referred to as DuPont). At the close of plaintiff's evidence, the Drainage District and Delaney went out of the case on motions for a directed verdict. Upon submission, the jury found against plaintiff and in favor of Cypress but returned a verdict of $4,000 for plaintiff and against DuPont. From the judgment on that verdict, DuPont appeals.

DuPont was sued as the manufacturer of Ammate X, a weed and brush killer, sold by Cypress, a dealer, to the Drainage District for use along its drainage ditches. Plaintiff's claim was that he had lost, by reason of "nitrate and nitrite poisoning from eating willow leaves" sprayed with Ammate X, eleven registered Hereford cows, one heifer and nineteen aborted calves and that he had incurred certain expenses incident to such loss. The alleged negligence of DuPont, as submitted in plaintiff's verdict-directing instruction 1, was ( in substance) the mislabeling of Ammate X as "not hazardous to livestock" although (so plaintiff asserts) "Ammate X when applied to trees and vegetation is an inherently and latently dangerous chemical in that it causes the trees and plants to produce an amount of nitrate and nitrite, which when eaten by livestock, may cause death and damage." DuPont's insistence that plaintiff did not make a submissible case necessitates a factual review, which we undertake with this prior emphasis upon the trite but basic principle that, in determination of this issue, we must consider the evidence in the light most favorable to plaintiff, must accord to him the benefit of all supporting inferences fairly and reasonably deducible from the evidence, and must disregard defendant's evidence except insofar as it may aid plaintiff's case. Daniels v. Smith, Mo., 323 S.W.2d 705, 706(2); Hildreth v. Key, Mo.App., 341 S.W.2d 601,

604(2); Anderson v. Welty, Mo.App., 334 S.W.2d 132, 134(2).

In June 1958, plaintiff, who lived in Sikeston, was pasturing two herds of Hereford cattle in nearby New Madrid County. One herd of twenty-six cows was on what plaintiff referred to as (and we hereinafter call) "the home place" on the east side of a north-and-south drainage ditch maintained by the Drainage District. The other herd of forty-four cows and one bull was on what is known as (and hereinafter called) "the Barnett farm" on the west side of the same drainage ditch opposite the home place. In that area, the levee is on the east side of the drainage ditch; and, with a fenced north-and-south road running along the top of the levee, plaintiff's herd on the home place could not reach the drainage ditch. The herd on the Barnett farm had access to the drainage ditch through a gap in the fence along the west side of the ditch right of way, usually watered in the drainage ditch, and frequently stood under the young willows at the water's edge. The Drainage District had given permission to plaintiff and other landowners along the ditch to run cattle on the ditch right of way—"it helped keep down vegetation."

As a part of the continuing program of the Drainage District to prevent encroachment upon and obstruction of the drainage ditch by luxuriant growth along the banks, employees of the Drainage District under the supervision of Ollie Delaney sprayed along the west bank of the ditch for a distance of 12.8 miles during the period from the latter part of May to the first part of July 1958. This sprayed segment of the ditch included about .75 mile contiguous to the Barnett farm, where the west bank had "a narrow ledge" of young willows at the water's edge "all along it." In this spraying operation, the Drainage District used Ammate X, a granular substance, put into solution according to the directions on the sack and sprayed from a boat which moved down the drainage ditch. The result was "almost a complete kill of the willows."

While employees of the Drainage District were spraying the bank contiguous to the Barnett farm during "the latter part of June," plaintiff asked supervisor Delaney "if I (plaintiff) ought to move the cattle out" and "if it would be harmful to them," to which Delaney gave definite negative answers and the further assurance that "we settled on buying the Ammate X" because the Drainage District "wanted to buy something so the boys wouldn't have to take their cattle out of the pasture." Delaney specifically testified that he had relied upon the statement printed on each bag that Ammate X, "when used in accordance with directions, is not hazardous to livestock." About July 15, 1958, and thus about two and one-half weeks after that section of the drainage ditch had been sprayed, plaintiff found a dead cow in his pasture on the Barnett farm. He then "thought that lightning had hit it." When, on July 23, plaintiff saw another dead cow and a sick cow on the Barnett farm, Dr. F. A. Stepp, a veterinarian at Sikeston, was called to the farm. The dead cow was badly decomposed. With respect to the sick cow, Dr. Stepp made a "tentative diagnosis" of "beginning pneumonia * * associated with a pasteurella infection" sometimes called "shipping fever," treated the cow for that condition, and took a blood sample which upon subsequent microscopic examination disclosed no evidence of anthrax or anaplasmosis. That sick cow was much better the next day and apparently recovered. None of the other cattle "showed any indication of being ill" on July 23.

However, when Dr. Stepp and his veterinarian partner, Dr. John R. Adams, were called to the Barnett farm the following day, July 24, they found three dead cows "in and around the (drainage) ditch"; and, in an autopsy on one of those cows, the veterinarians noted that "her rumen content was speckled all through with * dark brown willow leaves," identical in appearance with the dead leaves on the sprayed willows along the drainage ditch. Dr Stepp made a "tentative diagnosis of poi-

soning by a cause at that time unknown to me because the other diseases that might have killed the animal in my own mind had been ruled out"; and, not knowing what had been sprayed on the willows but suspecting that arsenic had been used, he preserved a sample of the contents of the rumen and reticulum (two of the cow's fore stomachs), which plaintiff delivered to Dr. G. E. Brown, head of the chemistry department at Southeast Missouri State College in Cape Girardeau. Dr. Brown's test of this sample for arsenic was negative. No other test was requested or made.

Four more cows died before (as plaintiff put it) "we decided what the trouble was" and moved the remainder of the herd from the drainage ditch right of way "sometime in August." Another cow died the next day but there were no more deaths in the period of about one month during which the cattle were excluded from the ditch right of way. Being unable to obtain "any definite answers on how long I (plaintiff) should keep them off, that the leaves might still be poisonous" and needing additional pasture at that time of year, plaintiff turned his herd back into the ditch right of way about September 17. Two days later another cow died. Dr. Stepp was called promptly and did a routine autopsy which disclosed that "there was a large amount" of willow leaves in the rumen, reticulum and omasum, the three fore stomachs ahead of the abomasum, the true stomach. The quantity of willow leaves found in this cow "was similar" to that found in the dead cow theretofore autopsied on July 24. Predicated on "everything I had seen in that area in all the trips I made," Dr. Stepp made a "tentative diagnosis" that the cause of death of the cow autopsied on September 19 was "nitrate and nitrite poisoning from eating willow leaves, subject to a chemical analysis."

Within five or six hours plaintiff delivered a sample of the stomach contents of this cow to Prof. A. L. Caskey, a chemist at the State College in Cape Girardeau, who on September 20 made a qualitative and semiquantitative test, known as "the brown ring test," for nitrates. This test showed "a very appreciable amount of nitrate" with concentration of "something like 150 parts per million, * * plus or minus 20 or 30 parts per million." The tested sample contained "an appreciable amount of willow leaves" estimated by Prof. Caskey as "in the order of ten per cent." Dr. Brown, who observed the test, confirmed the finding of "a considerable amount" of nitrates and also stated that the concentration of dead willow leaves in that sample was about the same as in the sample taken from the cow autopsied on July 24. As DuPont's counsel here emphasize, none of plaintiff's witnesses testified as to the quantity of nitrates which would constitute a lethal dose for a cow. However, Dr. Brown, who operated a 290-acre farm in Lewis County, Missouri, had had previous experience with nitrate poisoning of cattle and knew "considerable about it." Although he had lost no cattle by nitrate poisoning, he knew others who had; and, in the course of twenty-one years as a professor at Culver-Stockton College before coming to the State College in Cape Girardeau, he had run nitrate tests on silage which, when eaten by cattle, had resulted in death. According to Dr. Brown, the intensity of the concentration of nitrates in that silage was "about the same" as in the sample from plaintiff's cow autopsied in September.

■ The granular, crystalline substance sold under the registered trade-mark name of Ammate X is 95% ammonium sulfamate (or "ammonium salt," as Dr. Brown explained) and 5% inert ingredients, the latter being added to keep the product in free-flowing form. The parties agree that Ammate X, as sacked and sold, is not in that form toxic or poisonous. But, plaintiff's theory has been and is that, when put in solution and applied on foliage, Ammate X may cause the sprayed trees or plants to "produce" (more accurately stated, to draw from the soil) nitrates in such amount that, when the foliage is ingested by cattle, it may, and in this instance did, result in

nitrate poisoning and death. In its brief, DuPont recognizes that "plaintiff's evidence did show that nitrates form in the foliage of willows when they die"; and, in arguing that Ammate X is not "latently dangerous," DuPont's counsel include the sweeping statement that: "Its effect is patent. It kills trees, shrubs and weeds. The effect of death to willows and weeds is the concentration of nitrates in their foliage. This is well known. All of the witnesses—both those of plaintiff and those of defendant— so testified." In this connection, we note that an integral element of plaintiff's theory and submission, for which the testimony of Dr. Brown afforded support, was that the spraying of Ammate X in solution left "a salty residue" upon willow leaves which made them "particularly attractive to cattle." Cf. White v. Splawn, 16 Wash.2d 296, 133 P.2d 298, 299; Underhill v. Motes, 158 Kan. 173, 146 P.2d 374, 377. Plaintiff testified that cattle usually do not eat green willow leaves, but that he had observed his cattle on the Barnett farm eating dead willow leaves after they had been sprayed with Ammate X. During the period under consideration, plaintiff sustained no loss in his herd on the home place, which did not have access to the sprayed willows along the drainage ditch.

█ Defendant adduced substantial evidence tending to establish that the use of Ammate X on willows does not result in an unusual or lethal accumulation of nitrates in the sprayed foliage, and that the death of plaintiff's cows could not have been caused by ingestion of such foliage. But, a review of that evidence is omitted as without profit or significance here because of the firmly-established appellate policy not

to pass upon the weight of the evidence in jury-tried cases [Gould v. M. F. A. Mutual Ins. Co., Mo.App., 331 S.W.2d 663, 670-671(13), and cases there cited] and the time-honored admonition (hereinbefore noted) that, in determining whether plaintiff made a submissible case, we must disregard defendant's evidence except insofar as it may aid plaintiff.

█ The substance of the first three points in DuPont's brief is that it should have had a directed verdict because the evidence was insufficient to permit a finding that any of plaintiff's cows ingested sufficient nitrates to cause death. Since this appears to be the primary contention, upon which DuPont relies for reversal, we have given it careful consideration and exhaustive study, although none of the cases cited under these points [1] afford support for DuPont's position. No useful purpose could be served by our reviewing and repeating, sifting and sorting, elucidating and elaborating upon, the facts hereinbefore detailed. Suffice it to say that we are satisfied that, upon the record presented, the issue as to whether plaintiff's cows died of nitrate poisoning from eating the sprayed willow leaves was for the jury and may not be ruled as a matter of law.[2]

In its fourth point, DuPont urges that plaintiff did not make a submissible case because: "All of the evidence showed that Ammate X is not a poison, is not inherently dangerous, and is not latently dangerous. It further shows that the accumulation of nitrate in a plant is due to the death of the plant, regardless of the cause of such death. No finding of nitrite was made." In support of this point, counsel for DuPont refer

**1.** Kolie v. Ruby, Mo.App., 300 S.W.2d 545; Rogers v. Atchison, T. & S. F. Ry. Co., Mo.App., 283 S.W.2d 664; Bowman v. Heffron, Mo., 318 S.W.2d 269; Jenkins v. Wabash R. Co., Mo., 322 S.W.2d 788; Hart v. Midkiff, Mo., 321 S.W.2d 500; Hunter v. E. I. DuPont de Nemours & Co., D.C.Mo., 170 F.Supp. 352.

**2.** Abbott v. Vanmeter, 142 Ark. 601, 219 S.W. 330, 331(1); Williams Sign Co. v.

Rodgers, Tex.Civ.App., 24 S.W.2d 478 (1); Texas & N. O. R. Co. v. Jones, Tex.Civ.App., 242 S.W. 269(1); Thompson v. Walsh, 203 Okl. 453, 223 P.2d 357, 359–360(1, 2); Hale v. Lehigh Valley Ry. Co., 87 Pa.Super. 489, 492; 65 C.J.S. Negligence § 244a, loc. cit. 1090–1091, 1099 (footnote 5).

us to the same cases cited under their first three points. It is true that Ammate X is not, in and of itself, poisonous to cattle, whereas in most cases of this general character the spray or substance responsible for death has been poisonous.[3] But, proof that Ammate X was "a poison" was not an essential element of instant plaintiff's theory, the essence of which was the alleged mislabeling of Ammate X as "not hazardous to livestock" although (as plaintiff contended and the jury found) "Ammate X when applied to trees and vegetation is an inherently and latently dangerous chemical in that it causes the trees and plants to produce an amount of nitrate and nitrite, which when eaten by livestock, may cause death and damage."

 DuPont undertakes to oversimplify the issue of submissibility by its argument that Ammate X is not "inherently dangerous" because (as plaintiff's counsel agreed during trial) a cow "could eat a sack of that stuff" without harm, and that Ammate X is not "latently dangerous" because: "Its effect is patent. It kills trees, shrubs and weeds. The effect of death to willows and weeds is the concentration of nitrates in their foliage. This is well known." As DuPont urges, Ammate X may not be "inherently dangerous" within the judicial definition of that term as formulated and expressed in Hull v. Gillioz, 344 Mo. 1227, 1236, 130 S.W.2d 623, 628 (a landmark case in the "attractive nuisance" field), and thereafter quoted with approval in several Missouri cases,[4] *each involving the maintenance of a condition, not the use of a product,* that definition being: "Inherently dangerous means that danger inheres in the instrumentality or condition itself, at all times, so as to require special precautions to be taken with regard to it to prevent injury; instead of danger arising from mere casual or collateral negligence of others with respect to it under particular circumstances." But, in the class of cases with which we are concerned, a product, not at all times inherently dangerous within the quoted definition, may become so in its use for an intended purpose.[5] And *if it* were necessary to define "inherently dangerous" in this general category of actions, we would regard as more useful and appropriate the definition that "a product is, * * * inherently dangerous where the danger of injury therefrom stems from the nature of the product itself, and not to any

3. E. g., St. Louis-San Francisco Ry. Co. v. Fletcher, 159 Ark. 344, 253 S.W. 12, 33 A.L.R. 445; Mossrud v. Lee, 163 Wis. 229, 157 N.W. 758, 17 N.C.C.A. 214; Cole v. New England Tree Expert Co., 53 R.I. 67, 163 A. 742; White v. Splawn, 16 Wash.2d 296, 133 P.2d 298; Underhill v. Motes, 158 Kan. 173, 146 P.2d 374.

4. Vogrin v. Forum Cafeterias of America, Mo., 308 S.W.2d 617, 619 (terrazzo sidewalk not inherently dangerous but defendant negligent in failing to take precautions to prevent pedestrians from slipping thereon in rainy weather); Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 300 S.W.2d 490, 499 (contention that ballast and dust along roadbed were not inherently dangerous was "not wholly without merit"); Hiltner v. Kansas City, Mo., 293 S.W.2d 422, 426 (safety zone not inherently dangerous); Brown v. City of Craig, 350 Mo. 836, 840, 168 S.W.2d 1080, 1082 (city jail not inherently dangerous); Emery v. Thompson, 347 Mo. 494, 498, 148 S.W. 2d 479, 480 (railroad ties piled on right of way not inherently dangerous); Thompson v. Paseo Manor South, Inc., Mo.App., 331 S.W.2d 1, 6 (unprotected heating pipes so located that tenants in apartment house "could easily come in contact therewith" were inherently dangerous); Street v. W. E. Callahan Const. Co., Mo.App., 147 S.W.2d 153, 155 (cooper's bucket with heavy handle in upright, unlocked position was inherently dangerous).

5. Midwest Game Co. v. M. F. A. Milling Co., Mo., 320 S.W.2d 547, 551; Orr v. Shell Oil Co., 352 Mo. 288, 294, 177 S.W.2d 608, 612(2); Tayer v. York Ice Machinery Corp., 342 Mo. 912, 920, 119 S.W.2d 240, 242, 117 A.L.R. 1414, 1419; McLeod v. Linde Air Products Co., 318 Mo. 397, 406, 1 S.W.2d 122, 126(2); Alexander v. Inland Steel Co., 8 Cir., 263 F.2d 314, 322; annotation 105 A.L.R. 1502, 1503; annotation 17 A.L.R. 672, 683. See 1 Frumer & Friedman, Products Liability, § 5.03(1), p. 23 (1960).

defect in the product." Annotation 74 A.L.R.2d 1111, 1146 (1960). See also Farley v. Edward E. Tower & Co., 271 Mass. 230, 171 N.E. 639, 641(3), 86 A.L.R. 941, 944(3), and Dillard & Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 153 (1955).

However, we need not do judicial obeisance unto sterile definitions or, groping through an impenetrable fog of terminology, thrash about in a semantic morass. In product liability cases, the principal judicial interest in definition of "inherently dangerous" and "imminently dangerous"[6] usually has been in connection with stating or delineating exceptions (or determining whether given situations were within those exceptions) to the so-called privity rule (i. e., the requirement of privity of contract in a negligence action against the manufacturer or seller of a product), of which it has been said frequently in recent years that the exceptions have swallowed the rule. Annotation 74 A.L.R.2d 1111, 1128; Carter v. Yardley & Co., 319 Mass. 92, 64 N.E.2d 693, 700, 164 A.L.R. 559, 568. But, no such consideration here engenders interest in, or concern about, judicial definition of "inherently dangerous," for, although DuPont has sought refuge within the crumbling citadel of privity on some occasions [e. g., E. I. DuPont de Nemours & Co. v. Baridon, 8 Cir., 73 F.2d 26, 28; E. I. DuPont de Nemours & Co. v. Ladner, 221 Miss. 378, 73 So.2d 249, 254], it has not done so in this instance.

■ In the same attractive nuisance case [Hull v. Gillioz, supra] from which DuPont's counsel lift a definition of "inherently dangerous," it was stated [344

Mo. loc. cit. 1236, 130 S.W.2d loc. cit. 628] that "(m)ost duties, imposed by the law of torts, arise out of circumstances and are based on 'foreseeability' or reasonable anticipation that harm or injury is a likely result of acts or omissions."[7] Underscoring the importance of foreseeability, our Supreme Court (per Lamm, J.) said almost fifty years ago that "in the law of negligence, if a reasonable man can foresee the probability of a given consequence, that fact is enough to spring liability; for what a man knows and what he should know are equivalent in law. The actionable wrong arises in 'the failure to act with due foresight'—* * *." Benton v. City of St. Louis, 248 Mo. 98, 109, 154 S.W. 473, 476. The same principle has found expression and application in product liability cases in this state,[8] and distinguished contemporaries point to the manufacturer's duty to warn adequately of foreseeable and latent danger attendant upon proper and intended use of a product. 1 Frumer & Friedman, Products Liability, § 8.01, p. 143 (1960); 2 Harper & James, Torts, § 28.7, p. 1547 (1956). In short, "(t)he duty to warn unquestionably rests upon foreseeability, as does liability in negligence on other grounds in products liability cases." 1 Frumer & Friedman, Products Liability, § 8.03(1), p. 147. See Crist v. Art Metal Works, 230 App.Div. 114, 243 N.Y.S. 496, 499, affirmed 255 N.Y. 624, 175 N.E. 341. So, submissibility in the instant case did not depend upon a showing that Ammate X was "inherently dangerous" within the judicial definition of that term. Consult Smith v. Atco Co., 6 Wis.2d 371, 94 N.W.2d 697, 704(4), 74 A.L.R.2d 1095, 1104–1105(11).

---

6. A product is imminently dangerous "if, although it is not dangerous by its nature and is safe to be used for the purpose intended when properly constructed, it contains a defect which renders dangerous when applied to its intended use in the usual and customary manner." Annotation 74 A.L.R.2d 1111, 1165 (1960).

7. Emery v. Thompson, supra, 347 Mo. loc. cit. 498, 148 S.W.2d loc. cit. 480(3);

Street v. W. E. Callahan Const. Co., supra, 147 S.W.2d loc. cit. 155(3); Taylor v. Hitt, Mo.App., 342 S.W.2d 489, 494(7). See also 2 Harper & James, Torts, § 16.9, loc. cit. 929.

8. Arnold v. May Department Stores Co., 337 Mo. 727, 736, 85 S.W.2d 748, 753 (1); Barken v. S. S. Kresge Co., Mo. App., 117 S.W.2d 674, 679(9); Eddy v. Missouri Public Service Co., Mo.App., 309 S.W.2d 4, 9(4).

■■ The assignment that instant plaintiff did not make a submissible case also embraces the contention that Ammate X "is not latently dangerous." We agree with DuPont's counsel that a latent danger is one which is hidden, concealed, not visible or apparent [Black's Law Dictionary (4th Ed.), p. 1026; Webster's New International Dictionary (2nd Ed.), p. 1396], but their conclusion that Ammate X is not "latently dangerous" because "its effect is patent" in that "it kills trees, shrubs and weeds" and "the effect of (their) death * * * is the concentration of nitrates in their foliage" is a non sequitur. True, Ammate X is a weed and brush killer, it was used in the instant case for an intended purpose, and its effect on the sprayed willows was not latent in the sense that their death was desired and accomplished. However, plaintiff's evidence permitted the finding, which the jury made, that the use of Ammate X resulted in the concentration of nitrates in sufficient intensity and quantity to cause the death of cattle ingesting the sprayed foliage. *That effect,* which (as the jury found) resulted in plaintiff's loss, was not and is not conceded by DuPont. On the contrary, the bold pattern and unmistakable import of DuPont's evidence was that such *lethal* concentration of nitrates in the sprayed foliage did not occur and could not have occurred. There is no suggestion that, prior to his loss, plaintiff knew or should have known that the sprayed willows might draw from the soil nitrates in sufficient intensity and amount to make the dying or dead foliage dangerous to his browsing cattle; and, with DuPont's expert witnesses steadfastly denying that such danger arose or could have arisen, certainly we may not say that plaintiff should be charged with knowledge thereof. Haberly v. Reardon Co., Mo., 319 S.W.2d 859, 867(7). Consult also St. Louis Gas Light Co. v. American Fire Ins. Co. of Philadelphia, 33 Mo.App. 348, 368(2). On the record before us, that danger attendant upon the use of Ammate X was latent.

■■ Could the jury reasonably have found, as it did, that such danger also was foreseeable by DuPont? Obviously, foreseeability must be conditioned upon knowledge, actual or constructive, of unreasonable risk or danger attendant upon use of the product under consideration.[9] But, in manufacturing and distributing chemical weed killers, DuPont in that field is held to the skill of an expert, is charged with superior knowledge of the nature and qualities of its products, and is obligated reasonably to keep abreast of scientific information, discoveries and advances with respect thereto.[10] In this connection, we refer to certain additional evidence. During cross-examination of Dr. Brown, head of the chemistry department at Southeast Missouri State College, the following statement was read into the record from Morrison's "Feeds and Feeding" (22nd Ed.), identified as a textbook used in agriculture classes and available in the college library: "Plants injured by 2–4–D or other weed killers may have dangerous amounts of nitrates." Dr. Brown thought "that applies" and is "rather specific." While cross-examining plaintiff, DuPont's counsel pressed for the names of "published periodicals, pamphlets and articles" which plaintiff's petition alleged to have made available to defendant the knowledge that "Ammate X was inherently and latently dangerous in that * * * when applied to green leaves and foliage * * * (it)

9. Eddy v. Missouri Public Service Co., supra, 309 S.W.2d loc. cit. 9(5–7); E. I. DuPont de Nemours & Co. v. Baridon, 8 Cir., 73 F.2d 26, 30–31; 2 Harper & James, Torts, §§ 28.6–28.9, pp. 1546–1555; 1 Frumer & Friedman, Products Liability, § 8.03(1), loc. cit. 148; annotation 86 A.L.R. 947; annotation 26 A.L.R. 2d 963, 973.

10. Braun v. Roux Distributing Co., Mo., 312 S.W.2d 758, 763(1); 2 Harper & James, Torts, § 28.4, p. 1541; Id., § 28.7, p. 1551; 1 Frumer & Friedman, Products Liability, § 8.01, loc. cit. 144–145; Id., § 8.03, loc. cit. 148; annotation 86 A. L.R. 947, 950.

may cause nitrates and nitrites to develop in plants and vegetation so treated which is highly poisonous to livestock." Plaintiff said "there is several—I can't quote any numbers and all \* \* \* but Merck's Veterinary Manual is one" and shortly thereafter testified, *without objection or motion to strike*, that "what it (Merck's) says is Ammate X if properly fed through their feeds is not toxic to animals, but if it is sprayed on foliage it has sometimes been known to cause instant death." Regardless of whether this testimony might have been excluded upon objection or stricken upon motion, in the stated circumstances it was properly for consideration by the jury [11] as bearing upon the availability of information indicating danger attendant upon use of Ammate X. Braun v. Roux Distributing Co., Mo., 312 S.W.2d 758, 763.

 To have permitted the jury's finding against DuPont on the issue of foreseeability, it was not necessary " 'that damage as a more rather than less probable result should (have been) anticipated. \* \* Danger consists in the risk of harm, as well as the likelihood of it, and a danger calling for anticipation need not be of more probable occurrence than less. If there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it, then failure so to do is negligence. \* \* \* The test is not of the balance of probabilities, but of the existence of some probability of sufficient moment to induce action to avoid it on the part of a reasonable mind.' " [12] It may be that, even disregarding DuPont's evidence, this case approaches the legal horizon beyond which, as a matter of law, courts should not permit jurors to wander in search of foreseeability. But, whatever may be our personal persuasion as to this class of actions generally or as to the case at bar specifically, we may not close our eyes to the truth that, although reasonable foreseeability still "does not encompass the far reaches of pessimistic imagination" [Jamieson v. Woodward & Lothrop, 101 U.S.App.D.C. 32, 247 F.2d 23, 29, certiorari denied 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63], the outer limits, within which jurors presently are permitted to find foreseeability, are exceedingly broad and flexible in this jurisdiction [13] as in others.[14] In the judicial, economic and social climate of our day, we are constrained to believe and hold that, in the instant case, the issue of foreseeability was for the jury.

 If (as the jury found) the application of Ammate X to the willows left "a salty residue" upon the foliage which made it "particularly attractive to cattle" and also resulted in a lethal accumulation of nitrates in the foliage, and if (as the jury also found) in the exercise of ordinary care this should have been known to DuPont, certainly the evidence permitted the further finding that DuPont's labeling of Ammate X as "not hazardous to livestock" was misleading and constituted negligence. "An assurance of safety, as well as a failure to warn of danger, may be negli-

11. Vosburg v. Smith, Mo.App., 272 S.W.2d 297, 302(9), and cases collected in footnote 9; Lomax v. Sawtell, Mo.App., 286 S.W.2d 40, 42(1); Ferrell v. Sikeston Coca-Cola Bottling Co., Mo.App., 320 S.W.2d 292, 296(7), and cases collected in footnote 2.

12. Bean v. Ross Manufacturing Co., Mo., 344 S.W.2d 18, 25; Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 186, 123 A.L.R. 933, 938; Tullgren v. Amoskeag Mfg. Co., 82 N.H. 268, 276, 133 A. 4, 8, 46 A.L.R. 380, 387–388. See also Haberly v. Reardon Co., Mo., 319 S.W.2d 859, 863; Zuber v. Clarkson Const. Co.,

363 Mo. 352, 357, 251 S.W.2d 52, 55(6); Wilson v. White, Mo.App., 272 S.W.2d 1, 5(5, 6).

13. Witness the Bean, Haberly and Braun cases, supra.

14. E. g., Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626, 633(7); Hopkins v. E. I. DuPont de Nemours & Co., 3 Cir., 199 F.2d 930, 933–934; 2 Harper & James, Torts, § 16.5, loc. cit. 916; Id., § 16.10, p. 936; Dillard & Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 157.

gence. Indeed the case for negligence here is even stronger. Whether or not the words constituting assurance amount to a warranty, or to a fraud, they will amount to negligence if they unreasonably involve the chance of harm from the danger they conceal. And the assurance of safety may be negligence towards people to whom the assurance was not made and who did not in fact rely on it." 2 Harper & James, Torts, § 28.7, loc cit. 1548. See also 65 C.J.S. Negligence § 100b, loc. cit. 623; 1 Frumer & Friedman, Products Liability, § 8.05(2), p. 164; Id., § 8.04, loc. cit. 160. Mindful of the principle, so fundamental in jury-tried actions, that negligence does not become a matter of law alone, unless the acts or omissions upon which its existence depends are of such character that all reasonable men would agree,[15] and that a verdict may not be directed against plaintiff unless the facts, considered in the light most favorable to him, with all supporting inferences fairly and reasonably deducible therefrom, are so strongly against him as to leave no room for reasonable minds to differ,[16] we are impelled to conclude that the trial court did not err in refusing to direct a verdict for DuPont.[17]

What we have written on submissibility is dispositive of most of DuPont's complaints, as particularized in its next point, concerning plaintiff's verdict-directing instruction 1; but, we add these brief comments on the complaint "that there was no evidence upon which the jury could base a finding that Ammate X is poisonous." Instruction 1, almost two and one-half transcript pages in length, included preliminary findings that Ammate X was manufactured and sold by DuPont "for the purpose of killing and poisoning trees and other vegetation" and that the Drainage District purchased Ammate X "for the purpose of killing and poisoning willow trees and other vegetation in * * the right of way." Neither "poisonous" nor "poisoning" was mentioned elsewhere in the instruction. Admittedly, Ammate X was manufactured and sold "for the purpose of killing * * trees and other vegetation," including, among the trees specifically named on the sack, "willows"; and, admittedly the Drainage District purchased Ammate X for that purpose. Inclusion of "poisoning" in the quoted language was ill-advised and injudicious as well as superfluous and unnecessary, but nothing in instruction 1 suggested that Ammate X itself was poisonous to cattle or required any such finding. Reading and construing instruction 1 as a whole and all of the given instructions together [see 27 West's Missouri Digest, Trial, ☞ 295(1)], in the light of the cautionary admonition that, in considering the language of any instruction, we should not be hypercritical but rather should be concerned primarily with its meaning to a jury of

15. Steele v. Woods, Mo., 327 S.W.2d 187, 200; Cohagan v. Laclede Steel Co., Mo., 317 S.W.2d 452, 453(1); Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921, 926(6); Hill v. Torrey, Mo.App., 320 S.W.2d 594, 595(1).

16. Nelson v. O'Leary, Mo., 291 S.W.2d 142, 147(4); DeLay v. Ward, 364 Mo. 431, 262 S.W.2d 628, 633(4); Johnson v. Weston, Mo.App., 330 S.W.2d 160, 163; Bronson v. Kansas City, Mo.App., 323 S.W.2d 526, 531(12); Adkins v. Sutherland Lumber Co., Mo.App., 307 S.W.2d 17, 18(2).

17. See the following cases, in which *an assurance of safety was coupled with no warning or an inadequate warning:* Smith v. Atco Co., 6 Wis.2d 371, 94 N.W.

2d 697, 74 A.L.R.2d 1095; Crist v. Art Metal Works, 230 App.Div. 114, 243 N.Y.S. 496, affirmed 255 N.Y. 624, 175 N.E. 341; Henry v. Crook, 202 App.Div 19, 195 N.Y.S. 642; Dunn v. Ralston Purina Co., 38 Tenn.App. 229, 272 S.W.2d 479. And the following, in which there was *no warning:* Midwest Game Co. and Martin cases, supra; Farley v. Edward E. Tower & Co., 271 Mass. 230, 171 N.E. 639, 86 A.L.R. 941. And the following, in which there was *an inadequate warning:* the Bean, Haberly, Braun and Hopkins cases, supra; Tampa Drug Co. v. Wait, Fla., 103 So.2d 603; Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449; McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712.

ordinarily intelligent laymen, crediting them with common sense and average understanding of the English language [Gould v. M. F. A. Mutual Ins. Co., supra, 331 S.W.2d loc. cit. 671–672(15) and cases cited in footnotes 19, 20 and 21], we cannot say that, in the use of the word "poisoning" in the above-quoted preliminary findings or in any other particular assigned in DuPont's "Points Relied On," instruction 1 was prejudicial or misleading, or that error was committed materially affecting the merits of the action. Accordingly, we may not reverse the judgment for the giving of instruction 1. Rule 83.13(b), V.A. M.R.; V.A.M.S. § 512.160(2).

■ We pass DuPont's next point as nothing more than an abstract statement or assertion which presents nothing for appellate review. Rule 83.05, subd. (a) (3) and (e), V.A.M.R. [formerly Rule 1.08, subd. (a) (3) and (d)]; Magenheim v. Board of Education of School Dist. of Riverview Gardens, Mo., 340 S.W.2d 619, 621(3); State ex rel. Sisson v. Felker, Mo.App., 336 S.W.2d 419, 420(1).

DuPont also assigns error in refusal of its instruction D1 because (so counsel say) it "was the converse in part of instruction 1." This point (and, for that matter, all of DuPont's points pertaining to instructions) might well be disposed of summarily for failure to comply with the plain requirement of Rule 83.05(a), V.A.M.R., that "(i)f a point relates to the giving, refusal or modification of an instruction (or instructions), such instruction(s) shall be set forth in full in the argument portion of the brief unless the point can be readily discerned and understood from a reading of only the questioned portion of the instruction, in which event it shall be sufficient to set forth only the latter." See Brown v. Thomas, Mo.App., 316 S.W.2d 234, 237(9). But, considered on its merits, this point is without substance.

■ Finally, DuPont attacks plaintiff's instruction 2 on the measure of damages on the ground that it authorizes recovery (1) "for the value of unborn calves lost, although there is no allegation of such loss in the petition and no evidence as to the value of an unborn calf" and (2) "for the reasonable value of plaintiff's time expended in the treatment and handling of injured cattle, although there is no evidence thereof." We observe preliminarily that instruction 2 also permitted recovery "for the reasonable market value of the dead cattle" and "for the amount (of) the veterinary and chemist bills actually incurred in the diagnosis and treatment of the injured cattle." Considering first the aborted calves, it is true that plaintiff's petition contained no specific allegation of this item of damage; but, *without objection*, plaintiff testified concerning his loss of nineteen aborted calves and, *again without objection*, Dr. Stepp explained why plaintiff's cows "affected" (but not killed) by nitrate poisoning would have aborted their calves. In this state of the record, DuPont will not be heard to complain now that the item of damage for loss of the aborted calves was not within the pleadings. Rule 55.54, V.A.M.R.; V.A.M.S. § 509.500; Hart v. Midkiff, Mo., 321 S.W.2d 500, 507 (9); Evett v. Corbin, Mo., 305 S.W.2d 469, 474(5, 6). And, there was *evidence* to support submission of this item, for, in response to the question, "what is the value of a live dropped calf," plaintiff answered without objection "a hundred dollars."

■ Adverting to the complaint about plaintiffs time, we find averment of this item of damage in the petition, and plaintiff's testimony that, during the period from July 15 to October 1, 1958, he made two round trips (of fifty-two miles each) daily from his home to the Barnett farm for which an aggregate mileage charge of $390 would have been reasonable and, during the same period, made five round trips to Cape Girardeau for which an aggregate mileage charge of $33 would have been reasonable. But, there was no direct evidence as to "the reasonable value of plaintiff's time," so that item of damage should not

have been submitted. However, there is no complaint that the judgment is excessive; and, plaintiff's evidence on damages (undisputed in the record) indicates that, if (as the jury believed) plaintiff was entitled to a favorable finding on the issue of liability, the assessment of damages was modest. For, the only evidence as to the reasonable market value of the eleven cows lost by death and the nineteen aborted calves was $246 per cow and $100 per calf. Being satisfied that "the jury could not have allowed (plaintiff) anything of substance" [King v. City of St. Louis, 250 Mo. 501, 513, 157 S.W. 498, 501] for loss of his time, and likewise convinced that DuPont could not have been "prejudiced in the least by this instruction" [Lehmer v. Smith, 220 Mo.App. 251, 259, 284 S.W. 167, 170(10, 11)], we rule this point by honoring and following the "abundant authority in this state to the effect that where the damages awarded are not excessive and fairly represent the damages shown by the evidence, an erroneous or inaccurate instruction upon the measure of damages will not (necessarily) constitute reversible error." Blydenburgh v. Amelung, Mo.App., 309 S.W.2d 150, 153–154(8). See Rule 83.-13(b), V.A.M.R. [V.A.M.S. § 512.160(2)], and cases collected in West's Missouri Digest, Appeal and Error, ▮▮▮▮ For nothing more than the stated error in instruction 2, we decline to set aside the judgment and remand the cause for a new trial on the issue of damages.

Finding no reversible error in any particular assigned, the judgment is affirmed.

McDOWELL and RUARK, JJ., concur.

On Motions for Rehearing or to Transfer

STONE, Presiding Judge.

▮▮▮▮ The first section of DuPont's motion for rehearing or, in the alternative, to transfer rests uneasily on the palpably deceptive and patently fallacious reasoning that, although Ammate X caused the death of the sprayed willows and their dying caused the storing of nitrates, Ammate X did not cause such storing of nitrates. Suffice it to say that the judicially-accepted test as to causal connection is whether the facts show that, absent the negligent act, the injury or damage would not have been sustained [Housden v. E. I. DuPont de Nemours & Co., Mo., 321 S.W.2d 430, 433(3); Votrain v. Illinois Terminal R. Co., Mo., 268 S.W.2d 838, 843(4); Wood v. St. Louis Public Service Co., 362 Mo. 1103, 1109, 246 S.W.2d 807, 811(4)], and that it usually is sufficient to constitute proximate cause that the negligence charged was the efficient cause *which set in motion the chain of circumstances leading to the injury or damage*. Floyd v. St. Louis Public Service Co., Mo., 280 S.W.2d 74, 78(8); Thebeau v. Thebeau, Mo., 324 S.W.2d 674, 678(2); Hildreth v. Key, supra, 341 S.W. 2d loc. cit. 607(12).

The second section of DuPont's motion necessarily depends upon the similarly deceptive and equally fallacious reasoning that, even though Ammate X caused the death of the sprayed willows and their dying caused a lethal accumulation of nitrates, DuPont was not negligent in its labeling because Ammate X itself was not toxic or poisonous to cattle. But, by its labeling of Ammate X, DuPont recommended the use of that product for "difficult to control species * * * such as willow," gave detailed directions for "foliage spray application," and included the unqualified and unrestricted assurance that "Ammate X * * * when used in accordance with directions, is not hazardous to livestock." An inescapable incident of such recommended use, which (as pointed out in our opinion but conveniently ignored in DuPont's motion for rehearing) was an integral element of plaintiff's theory and submission, was that application of Ammate X left "a salty residue" on the willow leaves making them "particularly attractive to cattle." Thus, as the jury found, the use of Ammate X, in accordance with directions, not only caused the sprayed willows to die

and thereby to draw a lethal accumulation of nitrates into their foliage, but also made that foliage "particularly attractive to cattle."

■ In affirming the submissibility of plaintiff's case on the theory that DuPont's labeling of Ammate X was misleading in its failure to warn, we have not (as DuPont now complains) established any new principle of tort liability. On the contrary, we have but recognized and applied the settled principle, freshly stated with copious citation of supporting authority in Bean v. Ross Manufacturing Co., Mo., 344 S.W.2d 18, 25, that: "The supplier of a chattel is subject to liability for injury in its use by another when the supplier knows or should know that its use is or is likely to be dangerous and when there is no reason to believe that the user will realize this, if, further, he (the supplier) fails to use reasonable care to warn." See also Midwest Game Co. v. M. F. A. Milling Co., Mo., 320 S.W.2d 547, 551, in which plaintiff stated a cause of action for defendant's negligence in failing to warn that a packaged fish food was not a "complete" food, although it "was not inherently dangerous" and became dangerous "in the sense that sickness and death of fish would result" only when used as a "complete" food.

■ DuPont need not be exercised about possible misapplication of the instant decision in knife, ladder and bicycle cases. "Sufficient unto the day is the evil thereof" [Matthew 6:34] and unto the case the problems thereof. No two cases are poured in the same factual mold, and each must be ruled on its own facts. "What, if any, precautions are required (of a manufacturer) is a question that will vary with the circumstances and will, as always, depend upon a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." 2 Harper & James, Torts, § 28.4, loc. cit. 1542. The law does not impose upon manufacturers any duty to warn of many common dangers, for no one needs notice of what he already knows or reasonably may be expected to know. Jamieson v. Woodward & Lothrop, supra, 247 F.2d loc. cit. 25–30; 2 Harper & James, Torts, § 28.5, p. 1542. But, there has been and still is no suggestion that instant plaintiff either knew or reasonably might have been expected to know either that application of Ammate X might result in a lethal accumulation of nitrates in the sprayed willow leaves or that such application would leave "a salty residue" on the sprayed leaves which would make them "particularly attractive to cattle."

■ These closing comments are prompted by the gratuitous and brash adjuration of DuPont's counsel that we should not be concerned with the judicial, economic and social climate of our day and that our function is simply "to find the common law of England as it existed in 1607 and the statutory modifications thereof"—an admonition which becomes more than passing strange in the light of the fact that *counsel* do not undertake "to find the common law of England as it existed in 1607" with respect to the legal problems presented by this twentieth-century chemical weed killer case. Our Supreme Court has defined the common law as " 'a system of elementary rules and of general judicial declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions, and the exigencies and usages of the country.' " State ex rel. Schlueter Mfg. Co. v. Beck, 337 Mo. 839, 847, 85 S.W.2d 1026, 1029–1030. "(T)he common law is not a static but a dynamic and growing thing. Its rules arise from the application of reason to the changing conditions of society. It inheres in the life of society, not in the decisions interpreting that life * * *." Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 128 F.2d 645, 648(5); Roach v. Harper, 143 W.Va. 896, 105 S.E.2d 564, 568. And, "flexibility and capacity for growth and adaptation is the peculiar boast

and excellence of the common law." Hurtado v. People of State of California, 110 U.S. 516, 530, 4 S.Ct. 111, 118, 28 L.Ed. 232, 237; Funk v. United States, 290 U.S. 371, 382, 54 S.Ct. 212, 216, 78 L.Ed. 369, 375–376, 93 A.L.R. 1136, 1142; Barnes Coal Corp. case, supra, 128 F.2d loc. cit. 648. Such is the letter and the spirit of our Missouri cases [Yerger v. Smith, 338 Mo. 140, 154, 89 S.W.2d 66, 74(10); Byers v. Lemay Bank & Trust Co., 365 Mo. 341, 345, 282 S.W.2d 512, 515(3); State v. Kollenborn, Mo., 304 S.W.2d 855, 863], as well as those in other jurisdictions. Ney v. Yellow Cab Co., 2 Ill.2d 74, 117 N.E.2d 74, 79(11), 51 A.L.R.2d 624; Miller v. Monsen, 228 Minn. 400, 37 N.W.2d 543, 547(6); Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369, 375(13). We are no more impressed than is our Supreme Court by arguments relying on "social responsibility" and "fairness and justice" without demonstrated legal fault [Bean v. Ross Manufacturing Co., supra, 344 S.W.2d loc. cit. 25–26]; but, on the other hand, we immediately reject and emphatically deny DuPont's notion that our judiciary is so shackled and bound that its function is limited to finding "the common law of England as it existed in 1607 and the statutory modifications thereof."

DuPont's motion for a rehearing or, in the alternative, to transfer is overruled.

McDOWELL and RUARK, JJ., concur.